**AETNA CASUALTY AND SURETY COMPANY, Plaintiff,**

v.

**LEO A. DALY COMPANY, Defendant.**

**LEO A. DALY COMPANY, Third–Party Plaintiff,**

v.

**The WEITZ COMPANY, INC., Third–Party Defendant.**

**No. C 4–92–CV–90215.**

United States District Court, S.D. Iowa, Central Division.

Dec. 20, 1994.

---

**2.** The claimant's first application was denied February 11, 1991.

Joseph A. Happe, of Huber, Kelley, Book, Cortese & Happe, Des Moines, IA, for defendant/third-party plaintiff Leo A. Daly Co.

Brenton D. Soderstrum, of Shearer, Templer, Pingel & Kaplan, West Des Moines, IA, for third-party defendant Weitz Co.

**928**

## MEMORANDUM OPINION

BENNETT, District Judge.

I. PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 928
II. FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 929
 A. The Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 929
 B. Contract Provisions And Roles Of The Parties . . . . . . . . . . . . . . . . . . . . . . 929
 C. The Design And Construction Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 931
 D. Post–Incident Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 933
 E. Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 933
III. ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 934
 A. Elements Of A Negligence Cause Of Action . . . . . . . . . . . . . . . . . . . . . . . . 934
 B. Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 936
 1. Duty To Provide Adequate Designs . . . . . . . . . . . . . . . . . . . . . . . . . . . 936
 2. Duty To Supervise Or Inspect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 938
 3. Duty To Instruct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 938
 4. Duty To Build Adequately . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 939
 C. Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 939
IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 941

Plaintiff insurer of racetrack facilities brought this lawsuit against the defendant architect who designed the racetrack facilities for damages caused to the racetrack grandstand clubhouse when fire sprinkler pipes froze and burst. The racetrack declined to join in the lawsuit brought by its insurer. Defendant architect filed a third-party complaint for contribution against the construction company that had served as construction manager and general contractor for the building of the racetrack facilities. The insurer amended its complaint to add claims against the construction company. The construction company raised affirmative defenses asserting the liability of the architect for any damages to the insurer. On the eve of trial, the insurer settled its claims against the architect and construction company. The construction company then filed a cross-claim for contribution against the architect. The matter proceeded to trial before the court on the issues of the comparative fault of the architect and construction company in order properly to apportion the settlement with the insurer.

## I. PROCEDURAL BACKGROUND

Plaintiff Aetna Casualty and Surety Company originally filed this lawsuit on March 23, 1992, following damage to the grandstand clubhouse of its insured Racing Association of Central Iowa (RACI) at the Prairie Meadows racetrack caused by fire sprinkler pipes that froze and burst. RACI declined to join in the lawsuit. Aetna's lawsuit originally named as defendant the Leo A. Daly Company (Daly), the architect for the design of facilities at Prairie Meadows. Aetna's complaint alleged breach of contract, breach of warranty, and negligence. On January 4, 1993, Daly filed a third-party complaint against the Weitz Company, Inc. (Weitz), which had been the construction manager and general contractor for construction of the Prairie Meadows facilities. Daly's complaint against Weitz included claims of breach of contract, breach of warranty, and negligence, and essentially sought contribution from Weitz on Aetna's claims. Weitz responded with denials and affirmative defenses, asserting Daly's liability for any injury to Aetna's insured. On August 17, 1993, Aetna amended its complaint to add claims against Weitz.

On the eve of trial, Aetna settled its claims against both Weitz and Daly for $50,000. Weitz and Daly each paid half of the settlement. On May 10, 1994, Weitz filed a cross-claim against Daly for contribution. Weitz and Daly proceeded to trial before the court for a determination of the comparative fault of these parties on Aetna's negligence claims

in order to apportion the settlement amount between them. Trial to the court took place on May 24 and 25, 1994.[1] The parties submitted various trial and post-trial briefs, and the court concludes that this matter is fully submitted.

## II. FINDINGS OF FACT

### A. The Incident

On the night of December 21, 1989, fire sprinkler pipes in three of the grandstand clubhouse viewing areas of the RACI facility at Prairie Meadows froze and burst, causing extensive water damage to several floors of the grandstand building. The sprinkler pipes were concealed above the vaulted ceiling in the clubhouse viewing areas. Air was intended to circulate through the enclosed ceiling space as part of the air circulation system and to prevent the sprinkler pipes from freezing. To accommodate air circulation through the enclosed ceiling space, each vaulted roof had vents near its peak, and vents on the bottom, horizontal surface of the ceiling near the perimeter of the room. Some of the warm air from the air supply ducts of the heating and air conditioning system was also intended to be forced into the enclosed ceiling space during heating season from extensions of the ductwork, warming the enclosed ceiling space and percolating through the various ceiling vents. Earlier in the evening on December 21, 1989, however, guests at a party had complained that cold air was coming out of the horizontal ceiling vents around the perimeter of the room. Weather records for that date indicate that a stiff wind was blowing from the north-northwest. The temperature in the enclosed ceiling space eventually fell so low that the fire sprinkler pipes froze, causing them to burst, with resulting water damage to the Prairie Meadows clubhouse.

Following the bursting of these pipes, and before any inspection could take place, cleanup crews cut various holes in the walls and ceiling of the clubhouse, removed sheets of wet insulation, caused other damage, and generally obscured the prevailing conditions in the enclosed ceiling space at the time of the incident.

### B. Contract Provisions And Roles Of The Parties

The parties involved in the construction of the Prairie Meadows facilities operated under two bi-lateral contracts. One contract, hereinafter "the Architect's Contract," Exhibit 56, was between RACI and Daly. The other, hereinafter "the Construction Manager's Contract," Exhibit 57, was between RACI and Weitz, who was employed as the construction manager for the project, and who decided also to act as the general contractor. The Architect's Contract was a slight modification of a standard form contract provided by the American Institute of Architects, AIA Document B141/CM, entitled "Construction Management Edition Standard Form of Agreement Between Owner and Architect." Under this version of the contract, and hence this arrangement of the relationship among the parties, and because the Prairie Meadows project was a "fast track" project, as discussed further below, the architect did not bear the entire burden of design for the project under construction. Part of that burden was borne by the construction manager, who managed the construction project on site. The architect's inspection duties were also limited under the contract. The provisions of the contracts pertinent to the resolution of this matter are presented below.

In the Architect's Contract, Exhibit 56, Daly's design obligations are stated for each phase of the project. Daly had general design responsibilities in the pre-construction phases of the project, but the present lawsuit concerns Daly's responsibilities to review and approve design substitutions during the construction phase. The contract provisions pertaining to Daly's duties concerning suggested design substitutions are as follows:

1.5.11 The Architect's decision in matters relating to artistic effect shall be final if consistent with the intent of the Contract

1. Although I heard this case as a Magistrate Judge for the Southern District of Iowa, on August 30, 1994, I was appointed United States District Court Judge for the Northern District of Iowa. All federal district judges and magistrate judges in Iowa are cross-designated to preside over matters in both the Northern and Southern Districts.

Documents. The Architect's decisions on any other claims, disputes or other matters, including those in question between the Owner and the Contractor(s), shall be subject to arbitration as provided in this Agreement and in the Contract Documents.

**1.5.12** The Architect shall have authority to reject Work which does not conform to the Contract Documents, and whenever, in the Architect's reasonable opinion, it is necessary or advisable for the implementation of the intent of the Contract Documents, the Architect shall have authority to require special inspection or testing of Work in accordance with the provisions of the Contract Documents, whether or not such Work be then fabricated, installed or completed; but the Architect shall take such action only after consultation with the Construction Manager.

**1.5.13** The Architect shall receive Contractors' submittals such as Shop Drawings, Product Data and Samples from the Construction Manager and shall review and approve or take other appropriate action upon them, but only for conformance with the design concept of the Project and with the information given in the Contract Documents. Such action shall be taken with reasonable promptness so as to cause no delay. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

**1.5.14** The Architect shall review and sign or take other appropriate action on Change Orders prepared by the Construction Manager for the Owner's authorization in accordance with the Contract Documents.

Upon the owner's request, Daly was required to provide further design services and was entitled to additional compensation for such services pursuant to section 1.7. Those additional design services performed upon the owner's request were stated in sections 1.7.6 and 1.7.12:

**1.7.6** Providing services in connection with alternative designs for cost estimating or bidding purposes.

**1.7.12** Preparing Drawings, Specifications and supporting data and providing other services in connection with Change Orders requested by the Owner.

Daly's supervisory duties during the construction phase of the project were limited by sections 1.5.4 and 1.5.5 [2] of the Architect's Contract:

**1.5.4** The Architect shall visit the site at intervals appropriate to the stage of construction, or as otherwise agreed by the Architect in writing, to become generally familiar with the progress and quality of Work and to determine in general if Work is proceeding in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of Work. On the basis of such on-site observations as an architect, the Architect shall keep the Owner informed of the progress and quality of Work, and shall endeavor to guard the Owner against defects and deficiencies in Work of the Contractors.

**1.5.5** The Architect shall not be responsible for, nor have control or charge of, construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Project, and shall not be responsible for Contractors' failure to carry out Work in accordance with the Contract Documents. The Architect shall not be responsible for, nor have control over, the acts or omissions of the Contractors, Subcontractors, any of their agents or employees, or any other persons performing any Work, nor shall the Architect be responsible for the Construction Manager's obligations as an agent of the Owner.

Weitz's agreement with RACI, entitled "Agreement Between Owner And Construction Manager," Exhibit 57, establishes Weitz's duties to RACI. Weitz's contract with RACI provided that Weitz would also have design input during the pre-construc-

---

**2.** These provisions are mirrored in sections 2.3.4 and 2.3.5 of the General Conditions of the Con-

tract for Construction, Exhibit 69, which further states the roles and relationships of the parties.

tion and construction phases, but specifically exempted Weitz from liability for suggested design changes. During the pre-construction phase, the applicable section of the contract was section 1.1.5:

**1.1.5** Coordinate Contract Documents by consulting with the Owner and the Architect regarding Drawings and Specifications as they are being prepared, and, without assuming any design or engineering liability, recommending alternative solutions whenever design details affect construction feasibility, cost or schedules.

During the construction phase, the applicable section was similar:

**1.2.9** Without assuming any design or engineering liability, recommend necessary or desirable changes to the Architect and the Owner, review requests for changes, negotiate Contractors'/Subcontractors' proposals, submit recommendations for any changes from the bid documents to the Architect and the Owner, and if they are accepted, prepare and sign Change Orders for the Architect's signature and the Owner's authorization.

In its capacity as construction manager, Weitz was entitled to receive part of any costs savings it achieved in the construction of the project pursuant to section 5.2 of its contract with RACI:

**5.2** Upon the later of completion of the Work or substantial completion of the Project, a final accounting will be made to Owner of all costs incurred by the Construction Manager for the Work, including the Construction Manager's Fee. If such costs are less than the Guaranteed Maximum Price, as adjusted pursuant to this Agreement, such amount (the savings) shall, subject to paragraphs 3.2.4 and 7.1.2(s), accrue to Owner and to Construction Manager as follows:

| | DIVISION OF SAVINGS | |
| SAVINGS | CONSTRUCTION MANAGER | OWNER |
| --- | --- | --- |
| 1st $100,000 | 20% | 80% |
| Next $200,000 | 30% | 70% |
| All over $300,000 | 40% | 60% |

Weitz was also subject to the conditions stated in the "General Conditions of the Contract for Construction," Exhibit 69, prepared by the American Institute of Architects, AIA Document A201/CM, as modified by the parties. That document provides the relevant standards for performance of construction work in section 4.5, entitled "Warranty." The specific provision is section 4.5.1:

**4.5.1** The Contractor warrants to the Owner and the Architect that all materials and equipment furnished under this Contract will be new unless otherwise specified, and that all Work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. If required by the Architect or the Construction Manager, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment. This warranty is not limited by the provisions of Paragraph 13.2.

Finally, Weitz was required to instruct the owner on the proper operation of building systems by an additional contract document, Exhibit 72, section 15010, paragraph 1.03, subparagraph 2.a.:

·**2. Instructions in Operation.**

a. After all tests and adjustments have been made and the maintenance manual has been completed and given to the Owner, furnish one or more full-time qualified personnel as necessary to put the mechanical Work in continuous operation for a period of not less than 2 days, during which time and designated personnel's only purpose shall be to give complete operating and maintenance instructions to the operating personnel selected by the Owner, and furnish all service necessary for the proper operation and protection of the mechanical Work. Fuel, power and other supplies required during this period will be furnished by the Owner.

### C. The Design And Construction Process

The Prairie Meadows facilities were built as a "fast track" project, meaning that various stages of design and construction were conducted simultaneously, rather than construction following completion of design work for the entire project. Thus, the final design

of the facilities at Prairie Meadows evolved from original conception through construction. Final elements of the design of many parts of the clubhouse evolved from interaction among the architect, the construction manager/general contractor, independent contractors, and building inspectors.

The final design of the clubhouse roof and ceiling was one part of the Prairie Meadows project that resulted from such interaction. Weitz, in its capacity as construction manager, sought ways to save money on the roof and ceiling construction. Weitz therefore suggested a change in the design of the roof and ceiling system of the clubhouse that would still meet the applicable fire safety standards, but with considerable cost savings and greater ease of construction. The court need not identify every stage in the development of the roof design, but certain events are significant, because they relate to the efforts of those involved to address concerns about the possible freezing of the fire sprinkler pipes in the enclosed ceiling space.

On August 12, 1988, following a number of discussions and submissions of alternative designs of the roof and ceiling systems, Weitz's Project Manager, Frank Sedlacek, sent Daly's Director of Contract Administration, David L. Richardson, a letter to confirm Weitz's proposal to alter the roof and ceiling design for the clubhouse. Exhibit 26. The critical parts of that letter for this litigation detailed changes to the construction of the enclosed ceiling space by creating a cold air soffit, exposed to outside air, in the part of the enclosed ceiling space overhanging the exterior wall of the building, and a warm air soffit, in which the fire sprinkler system pipes would run, in the part of the ceiling over the public areas of the clubhouse. The letter stated in pertinent part:

4. At the exterior wall of the building, which is common to the three large vaulted areas (that exterior wall lying west of "B" line), we will add light gauge 3-½" C-stud extensions to the existing 6" structural studs of the building (by screw attaching such stud extensions into the side of the existing studs) thus extending the wall up to within approximately 2" of the existing

vinyl wrapped insulation under the metal roof assembly.

5. We will extend the exterior sheeting board vertically from its present "cut-off" line to within approximately 2" of the existing vinyl wrapped roof insulation.

6. We will install exterior wall blanket insulation so as to extend the outside insulation from existing "cut-off" point up to the existing vinyl faced insulation below the metal deck; such insulation will be tucked over the top of the added exterior sheeting so as to create an air seal at the top of the exterior wall line of the building with the existing vinyl wrapped insulation under the metal deck; thereby, isolating the soffit area of the roof assembly which projects beyond the exterior wall line of the building.

7. We will extend the interior 4 mil vapor barrier on the inside face of the new stud extensions up to the vinyl wrapped roof insulation, and at that point tape the two vapor barriers together (i.e. the wall and the roof vapor barriers would join).

Exhibit 26. Sedlacek's letter also addressed concerns about condensation in the newly-created cold air soffit by proposing grill work open to the circulation of outside air, and addressed concerns about freezing of the fire sprinkler pipes by proposing installation of grills or vents in the slanted and horizontal parts of the ceiling in the public areas to provide circulation of warm air. Furthermore, the letter suggested forcing warm air from the heating ductwork into the ceiling space via six-inch round ducts tapped into the existing ductwork. These ductwork extensions were to be dampered, so that they could be opened or closed as the heating season arrived or passed. These changes, in conjunction with the roof modifications, were expected to result in considerable cost savings. RACI eventually recommended acceptance of Weitz's proposals, and Daly therefore authorized the changes.

None of the parties ever produced "as-built" drawings of the final configuration of the cold and warm air soffits in the club-

house, nor does it appear that Weitz conducted the actual construction of the soffits from drawings provided by Daly based on Weitz's suggested changes. The court was presented with drawings of various stages of the development of the soffit design and an after-the-fact drawing of what inspectors believed to be the "as-built" configuration of this part of the ceiling structure.

### D. Post–Incident Condition

Experts hired by the parties to determine the cause of the sprinkler pipe freeze-ups observed holes in the vapor barrier and insulation between the exterior, cold air soffit, and the interior, warm air soffit, although they could not say whether those holes were the result of poor construction techniques, the ravages of the clean-up crew, or post-incident repairs. They also found poorly installed insulation leaving gaps where structural steel for the roof assembly pierced the extended wall and protruded from the warm air soffit into the cold air soffit, and lack of insulation on that structural steel. They also discovered that the extensions of the ductwork intended to introduce warm air into the warm soffit were "capped," with the caps in place, a warm weather condition, shortly after the pipes froze. No party presented any evidence that it or its opponent suggested, intended, designed, or installed such caps for the ductwork extensions. All parties agreed that the additional ductwork was to be controlled by dampers which opened the air ducts for heating season, or closed them for cooling season. Finally, there was no sheetrock or wall board on the interior side of the stud extensions. The extension of the wall upward into the ceiling area, dividing the warm air soffit from the cold air soffit, therefore consisted of 3–½″ stud extensions mounted to the top of the six-inch studs in the wall proper, exterior sheeting board, insulation mounted between studs and folded over the top of the exterior sheeting board, and an interior vapor barrier glued to the underside of the insulation on the interior side of the roof.

### E. Expert Testimony

The experts produced by the parties, all either engineers or architects, provided differing analyses of the cause of the frozen pipes in the ceiling of the Prairie Meadows clubhouse. Dr. Jerry Lee Hall, the expert hired by Aetna, concluded that the original design of the soffits provided for inadequate circulation of warm air within the enclosed ceiling when strong winds blowing into exterior vents disturbed the intended flow of air. As a result, Dr. Hall concluded, insufficient warm air would circulate over the sprinkler pipes and areas of cold air would develop. He concluded that the condition was a defect in the architect's design for providing sufficient heat to prevent pipes from freezing. Dr. Hall suggested eliminating the problem by introducing forced ventilation of the ceiling area with warm air, unaware at the time of his report that ductwork was already in place that was intended to introduce warm air into the soffit. Dr. Hall also suggested installation of heat tapes on sprinkler pipes, a partial remedy that was eventually introduced. He also suggested hinged doors or flaps to allow for sealing of exterior vents during extreme cold weather.

Dr. Robert J. Kudder, the expert hired by Daly to analyze the freezing of the sprinkler pipes in the Prairie Meadows clubhouse concluded that the entry of cold air into the warm air soffit was the result of inadequate sealing of the air barrier between the warm and cold soffits. He identified several air-paths around the top and sides of rafters, airflow through areas, such as corner areas, where there were no 3–½″ studs to which insulation could be attached and insulation had therefore been "stuffed" into the areas, and airflow over the top of the extended wall between it and the underside of the roof insulation. Dr. Kudder concluded that inadequate sealing of the vapor barrier also allowed for air paths. Dr. Kudder asserted that recent repairs had reduced, but not eliminated the flow of exterior air into the interior soffit, reducing, but not eliminating the possibility of future freezing of the sprinkler pipes.

Mr. Bruce Bassler, Weitz's expert, testified that he believed the cause of the freezing of the pipes was the conduction of cold air into the warm soffit by structural steel that penetrated the barrier between warm and cold air soffits. He testified that conduction

would produce a far more dramatic reduction in temperatures in the warm air soffit than would air leakage from outside. He identified this penetration of the thermal barrier by the structural steel as a design flaw that would have been apparent to an architect who properly fulfilled his duties by doing drawings of the changes proposed by Weitz. Mr. Bassler also testified that he believed the architect had the duty to instruct the owners of the building in its proper operation, and the capped ductwork in the ceiling indicated the inadequacy of that instruction. However, when confronted with the contract documents that placed the duty to instruct the owner in operation of building systems on the construction manager, Mr. Bassler discounted the importance of the capped ductwork and other operating flaws to the causation of the problem of the frozen pipes.

## III. ANALYSIS

Daly and Weitz each argue that their own contract with RACI limits their design and inspection duties, and limits or excuses them from liability for any design flaws, particularly, in the case of Daly, if the design change was the suggestion of another party. Each also asserts that the other's contract with RACI establishes the other's duty to perform design work and inspections. Each of the parties argues that the other breached its duties, causing the pipes to freeze. Daly further argues that the cause of the frozen pipes was Weitz's breach of its duty to instruct the owner, in writing, in the proper operation of the facilities. Weitz argues that its subcontractor performed that duty to instruct the owner by giving oral instructions on operation of the building. The parties argue that breach of contractual duties establishes liability for negligence and breach of contract, such that the breaching party should be wholly liable for the settlement paid to Aetna.

### A. Elements Of A Negligence Cause Of Action

■ Because the negligence causes of action are based on alleged breach of contractual duties, the negligence claims and the breach of contract or breach of warranty claims all depend on the same allegations of breach of contract. The court therefore does not make a separate analysis of breach of contract or breach of warranty claims. *See, e.g., M & W Farm Service Co. v. Callison,* 285 N.W.2d 271, 276 (Iowa 1979) (breach of contractual duty is tort founded on contract); *Mid–Country Meats, Inc. v. Woodruff Evans Constr.,* 334 N.W.2d 332, 336 (Iowa App. 1983) (same).[3] Instead, the court considers whether either party has proven the negligence of the other based on breach of contractual duties.

■ The elements for a cause of action for negligence are:

(1) the existence of a duty to conform to a standard of conduct for the protection of others; (2) failure to conform to that standard; (3) a reasonably close causal connection ...; and (4) damages.

*Smith ex rel. Estate of Smith v. Shaffer,* 395 N.W.2d 853, 855 (Iowa 1986) (*en banc*) (citing *Haafke, infra.*); *Bockelman v. State,* 366 N.W.2d 550, 552 (Iowa 1985); *Haafke v. Mitchell,* 347 N.W.2d 381, 385 (Iowa 1984) (citing W. Prosser, HANDBOOK OF THE LAW OF TORTS § 30, at 143 (4th ed. 1971)). Negligence is generally defined as conduct that falls below the standard established by law for the protection of others against unreasonable risk of harm. *Knake v. King,* 492 N.W.2d 416, 417 (Iowa 1992); *Peters v. Burlington Northern R.R. Co.,* 492 N.W.2d 399, 401 (Iowa 1992) ("Negligence is the breach of a legal duty or obligation."); *Shaffer,* 395 N.W.2d at 855; *M.H. v. State,* 385 N.W.2d 533, 537 (Iowa 1986); *Seeman v. Liberty*

---

**3.** *See also Giarratano v. Weitz Co.,* 259 Iowa 1292, 1305, 147 N.W.2d 824, 832 (Iowa 1967), for the following:

It appears to be well settled in Iowa that where a contract imposes a duty upon a person, the neglect of that duty is a tort, and an action ex delicto will lie. "A tort may be dependent upon, or independent of, contract. If a contract imposes a legal duty upon a person the

neglect of that duty is a tort founded on contract, so that an action ex contractu for the breach of the contract, or an action ex delicto for the breach of the duty, may be brought at the option of the plaintiff." *Matthys v. Donelson,* 179 Iowa 1111, 1116, 160 N.W. 944, 946; *Kunznan v. Cherokee Silo Co.,* 253 Iowa 885, 891, 114 N.W.2d 534, 537.

*Mut. Ins. Co.*, 322 N.W.2d 35, 37 (Iowa 1982); *Lewis v. State*, 256 N.W.2d 181, 188 (1977); *Ewoldt v. City of Iowa City*, 438 N.W.2d 843, 844 (Iowa App.1989).

■■■ The threshold element for a negligence action is a duty or standard of care owed by the actor to the victim. *Knake*, 492 N.W.2d at 417; *Peters*, 492 N.W.2d at 401; *Shaw v. Soo Line R.R.*, 463 N.W.2d 51, 53 (Iowa 1990). A particular relationship between the actor and victim is not an absolute requirement in establishing a legal duty or standard of due care, especially when the consequences of a negligent act cause harm to another. *Knake*, 492 N.W.2d at 417; *Keller v. State*, 475 N.W.2d 174, 179 (Iowa 1991). Generally, the issue of duty in a negligence cause of action is whether the defendant acted as would a reasonably careful person under like circumstances. *Knake*, 492 N.W.2d at 417; *Brichacek v. Hiskey*, 401 N.W.2d 44, 47 (Iowa 1987). The question of whether a party's conduct is reasonable is usually one of fact rather than one of law. *Knake*, 492 N.W.2d at 417.

■■■ A statutory enactment may create an applicable duty or standard of care. *M.H.*, 385 N.W.2d at 537; *Seeman*, 322 N.W.2d at 37. It is also well established that a contract may give rise to a duty, the breach of which may be tortious. *M & W Farm Service Co. v. Callison*, 285 N.W.2d 271, 276 (Iowa 1979); *Mid–Country Meats, Inc. v. Woodruff Evans Constr.*, 334 N.W.2d 332, 336 (Iowa App.1983). Whether the contract establishes such a duty of care is a question of law for the courts to decide. *Mid–Country Meats*, 334 N.W.2d at 336. It has also been held that there is an implied duty to perform construction contract work with due care. *Busker v. Sokolowski*, 203 N.W.2d 301, 303 (Iowa 1972); *Mid–Country Meats*, 334 N.W.2d at 336. Negligent construction under a contract may also amount to a breach of the contract. *See Mid–Country Meats*, 334 N.W.2d at 336; *Metropolitan Transfer Station Inc. v. Design Structures Inc.*, 328 N.W.2d 532, 538 (Iowa App.1982); *Giarratano v. Weitz Co.*, 259 Iowa 1292, 1305, 147 N.W.2d 824, 832 (Iowa 1967). Contracts may also exempt parties from liability for the contracting party's negligence if such a con-

tract is not against public policy owing to some statutory prohibition. *Giarratano*, 259 Iowa at 1304, 147 N.W.2d at 831 (citing *Sears, Roebuck and Co., Inc. v. Poling*, 248 Iowa 582, 587, 81 N.W.2d 462, 465, and citations therein; *Weik v. Ace Rents Inc.*, 249 Iowa 510, 514, 87 N.W.2d 314, 317; *Bashford v. Slater*, 250 Iowa 857, 865, 96 N.W.2d 904, 909.)

■■■ Causation is another essential element in a tort action. *Mulcahy v. Eli Lilly & Co.*, 386 N.W.2d 67, 72 (Iowa 1986); *Iowa Electric Light & Power Co. v. General Electric Co.*, 352 N.W.2d 231, 234 (Iowa 1984). In a negligence action, the causation requirement entails proof of a "causal connection between the defendant's alleged negligence and the injury." *Mulcahy*, 386 N.W.2d at 72; *Sponsler v. Clarke Elec. Coop., Inc.*, 329 N.W.2d 663, 665 (Iowa 1983). " 'Causation goes to the question of what instrumentality or mechanism caused plaintiff's injury.' " *Mulcahy*, 386 N.W.2d at 72 (quoting *McElhaney v. Eli Lilly & Co.*, 564 F.Supp. 265, 268 (D.S.D.1983)).

The Iowa Court of Appeals recently made the following observations about the causation element of a negligence cause of action under Iowa law:

Causation is a necessary element in all negligence cases. It is actually composed of two related but separate concepts. The first considers the actual cause of the harm. This is known as "cause-in-fact." The second part embraces the legal cause of the injury. This is known as "proximate cause." Even though an act of the defendant may be the factual or actual cause of the plaintiff's injury, liability will only be imposed if it is also a proximate or legal cause of the injury.

The test to determine the actual cause prong of causation is known as *sine qua non;* but for the defendant's conduct, the harm would not have occurred. *State v. Marti*, 290 N.W.2d [570] at 585 [ (Iowa 1980) ]. The test to determine proximate or legal cause is more involved. Generally, an actor's conduct is a proximate or legal cause of harm to another if the conduct is a "substantial factor" in producing the harm and there is no other rule of law which

relieves the actor of liability because of the manner in which the negligence resulted in the harm. *Kelly v. Sinclair Oil Corp.*, 476 N.W.2d [341] at 349 [ (Iowa 1991) ]. Iowa follows the Restatement (Second) of Torts in using the "substantial factor" test to help determine the existence of proximate or legal cause. *Id.; Frederick v. Goff*, 251 Iowa 290, 298, 100 N.W.2d 624, 629 (1960). This test is found in uniform instruction 700.3, together with the "but for" test. *Sumpter v. City of Moulton*, 519 N.W.2d 427, 434 (Iowa App.1994).[4] *See also Jones v. City of Des Moines*, 355 N.W.2d 49 (Iowa 1984) (defining proximate cause as the substantial factor and but for cause).

▮▮▮ Proof of the causation element of the negligence cause of action thus requires proof that defendant's conduct was a substantial factor in bringing about plaintiff's harm before defendant's conduct can be found to be a proximate cause of that harm. *Shaffer*, 395 N.W.2d at 857; *Iowa Electric*, 352 N.W.2d at 234; *Sumpter*, 519 N.W.2d at 434. If an actor's conduct is not a substantial factor in bringing about the plaintiff's harm, or if it is a substantial factor but is superseded by later forces or conduct, then the actor's conduct does not constitute the legal cause of the plaintiff's harm. *Shaffer*, 395 N.W.2d at 857; *Schnebly v. Baker*, 217 N.W.2d 708, 729 (Iowa 1974). There can be more than one proximate cause to a plaintiff's injuries. *Welte v. Bello*, 482 N.W.2d 437, 442 (Iowa 1992).

▮▮▮ The negligence of a professional must ordinarily be shown by expert testimony. *Forsmark v. State*, 349 N.W.2d 763, 768 (Iowa 1984). However, under Iowa law, it is not necessary to present expert testimony to prove breach of a professional standard of care if negligence can be recognized with the common experience and knowledge of lay persons. *See, e.g., Welte v. Bello*, 482 N.W.2d 437, 441 (Iowa 1992) (no expert testimony required for jury to decide whether

doctor breached professional standard of care by injecting incorrect medication resulting in chemical burns); *Oswald v. LeGrand*, 453 N.W.2d 634, 639–40 (Iowa 1990) (no expert required in medical malpractice case for poor patient relations); *Devine v. Wilson*, 373 N.W.2d 155, 157 (Iowa App.1985) (no expert required in suit against attorney for breach of duty of professional care).

### B. Duty

Each party has asserted several duties to which it believes the other was subject, and that the other party's breach of one or more of those applicable duties makes the breaching party wholly liable for the settlement with Aetna. Daly alleges that Weitz, not Daly, was responsible for producing an adequate design for the soffit areas. Next, Daly asserts that Weitz had the duty to provide inspection and supervision to ensure that construction of the soffits was adequate. Daly also asserts that Weitz had a duty to instruct the owner in the proper operation of the building. Finally, Daly asserts that Weitz had a duty to construct what it said it would construct and to do so adequately.

Weitz asserts, on the contrary, that Daly bore the duty to design an adequate soffit and the duty to inspect and supervise construction of that soffit. Weitz also argues that it constructed what it said it would construct in a good and workmanlike manner, and that if the structure constructed was inadequate in design, it was Daly's duty to discover any flaws.

### 1. Duty To Provide Adequate Designs

The analysis of the duty of the parties to provide adequate designs in this case requires further discussion in this case, because it involves the duty of design professionals acting pursuant to contracts. Each party asserts that the applicable duty was created for the other by the other's contract

---

4. The proximate cause test articulated in the Iowa Civil Jury Instructions is as follows:

**Proximate Cause—Defined.** The conduct of a party is a proximate cause of damage when it is a substantial factor in producing damage and when the damage would not have happened except for the conduct.

"Substantial" means the party's conduct has such an effect in producing damage as to lead a reasonable person to regard it as a cause. Iowa Civil Jury Instruction No. 700.3.

and that each party's own contract limited its liability for design work or supervision of construction.

Iowa courts have held that design professionals cannot limit by contract their liability for inadequate design in all circumstances:

"We cannot agree defendant architect can so easily wash off his duty to the public generally for harm resulting from negligence in furnishing plans and specifications which cause damage during the work itself. We reject the ingenious and startling theory that a person can, by contract with a third party, lay down his own rules as to when he will be liable to those whom his negligence injures.

"If defendant architect negligently prepared plans and specifications and if plaintiffs were thereby damaged, defendant architect—like everyone else—is responsible for the consequences of that negligence. This is what the trial court instructed, and we believe it did so correctly."

*Evans v. Howard R. Green Co.*, 231 N.W.2d 907, 912 (Iowa 1975) (quoting *McCarthy v. J.P. Cullen & Son Corp.*, 199 N.W.2d 362, 370 (Iowa 1972)). The court then noted and approved the following:

"An architect may be held liable for negligence in failing to exercise the ordinary skill of his profession, which results in the erection of an unsafe structure whereby anyone lawfully on the premises is injured. An architect's liability for negligence resulting in personal injury or death may be based upon his supervisory activities or upon defects in the plans. The liability of the architect, moreover, is not limited to the owner who employed him; the modern view is that privity of contract is not a prerequisite to liability. * * *." (Emphasis added.) 5 Am.Jur.2d, Architects, § 25, page 688. See also Annot., 59 A.L.R.2d 1084; Sobel, Architect Tort Liability in Preparation of Plans and Specifications, 55 Cal.L.Rev. 1361, 1372.

*Id.* Following *Evans*, the Iowa Supreme Court has also held that a construction company could not limit its duty to a person injured on the premises either by contract with the owner or by the owner's approval of the construction company's architect's plans and specifications. *Truscheff v. Abell–Howe Co.*, 239 N.W.2d 116 (Iowa 1976).

A design professional may also have duties that are not defined by contract:

We adhere to the general law in this regard and find the following to be applicable in this case: "An architect may be held liable for negligence in failing to exercise the ordinary skill of his profession, which results in the erection of an unsafe structure whereby anyone lawfully on the premises is injured."

*Fox v. Stanley J. How & Assocs.*, 309 N.W.2d 520, 523 (Iowa App.1981) (quoting *Evans*, 231 N.W.2d at 913). Iowa courts recognize a professional standard of care for negligence actions against architects or engineers. *Schmitt v. Clayton County*, 284 N.W.2d 186, 189 (Iowa 1979) (citing *Schiltz v. Cullen–Schiltz & Assoc., Inc.*, 228 N.W.2d 10, 17 (Iowa 1975), concerning engineers, and *Evans*, 231 N.W.2d at 913, concerning architects).

The court concludes first that the design professionals here could properly limit by contract their liability for the harm alleged, because the harm did not involve physical injury or death to any person, as was the circumstance in the cases cited above rejecting contractual limitations on liability. Thus, the contractual limitations here were not in violation of public policy, and are therefore valid. *Giarratano*, 259 Iowa at 1304, 147 N.W.2d at 831. Furthermore, the harm for which liability is sought to be disclaimed *is* harm to the contracting party, and not harm to a third party. It is RACI that suffered any injury as the result of the alleged design flaws surrounding the frozen sprinkler system. Weitz's or Daly's "harm" flowing from that event is only liability, not injury.

The court next concludes that the contracts in question created a lacuna for liability for the design flaw alleged. Daly asserts that Weitz should be liable for any design flaw in the soffits because the change in design originated with Weitz. However, Weitz's contract with RACI specifically states that Weitz shall have no design liability for changes it suggests. Exhibit 57, sec-

tion 1.1.5. By the same token, section 1.5.13 of the Architect's Contract, Exhibit 56, states that Daly's review of the contractor's submittals is limited to conformance with the design concept and with the information given in the contract documents. Furthermore, that section of Daly's contract also states that the architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component. Thus, Daly had no duty to evaluate the performance of a proposed design substitution. As a further point, the change here was not one involving "artistic effect," for which the architect has the final word under section 1.5.11 of the Architect's Contract. Rather, the design of the soffits had no artistic effect whatsoever, as the interior design of the soffits was hidden. Thus, under section 1.5.11, Daly could properly defer to the instructions of the Owner to accept the design change. Finally, Daly's duty to conduct an evaluation and drawings of any design change was limited by the contract provisions making such services "additional" and dependent upon RACI's request. *See* Exhibit 56, sections 1.7.6 and 1.7.12. RACI made no such request concerning the soffit design. Finally, although Weitz was authorized to request design clarifications from Daly pursuant to the "General Conditions of the Contract for Construction," Exhibit 69, section 2.3.11, it did not do so with regard to the construction of the soffits. As a result of the interplay of these contract provisions, neither of these parties bore the legal duty to ensure that the design change here would perform adequately.[5]

### 2. Duty To Supervise Or Inspect

■■■■ Each party insists that the other had a duty to inspect or supervise the soffit construction to ensure that it was adequate.

Daly's contract specifically limited the extent to which it was to inspect construction on the project. Section 1.5.4 of Daly's contract states that "the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of Work." Exhibit 56. Furthermore, under section 1.5.5 of its contract, Daly could not be held liable for any acts or omissions of anyone performing work on the project. Although Weitz had a contractual duty to ensure the adequacy of all work, Exhibit 69, section 4.5.1, Daly has identified no provision of the contract that placed on Weitz a duty to inspect.[6] Rather, Daly's assertion is that Weitz was better able to perform such inspection and supervision than Daly because it had staff on site continuously. The fact that Weitz might have been better able to perform some task than Daly does not create a duty for Weitz to perform that task.

### 3. Duty To Instruct

■■■■ Daly argues that Weitz had the duty to provide written instruction to RACI personnel on the proper operation of systems in the Prairie Meadows clubhouse, and that it breached that duty. Daly seems to argue that proper instruction by Weitz could have prevented operator error that caused the freezing of pipes in the clubhouse. Weitz did have a duty to instruct the operator of the facilities pursuant to provisions found in the contract documents, Exhibit 72, section 15010, paragraph 1.03, subparagraph 2.a. However, that duty was *not* to provide written instruction as Daly asserts. Rather, the duty specified in that provision of the contract documents was to provide on-site instruction during actual operation of systems. Exhibit 71 demonstrates that Weitz's subcontractor, Waldinger, provided the required in-

---

5. Daly asserts that under the Construction Documents, Exhibit 72, section 1.07, Weitz was required to certify that the design change would perform adequately. However, the court finds nothing in that section of the Construction Documents that pertains to design changes. Rather, the cited provisions refer to substitution of material and equipment. Furthermore, Daly's assertion that Weitz should be liable for any flaw in the design change because Weitz had qualified professional staff to perform a complete evaluation misses the point that Weitz had no duty to

perform such an evaluation, and had specifically exempted itself by contract for liability for any design change it suggested.

6. The court recognizes that it would be difficult to ensure that work done is adequate without inspecting it as it is performed. However, a warranty that work will be adequate does not establish a duty to inspect, only liability if the work is subsequently shown to be inadequate.

struction to RACI personnel. There was no breach of the duty to instruct here.

### 4. Duty To Build Adequately

 Daly is correct in asserting that Weitz had a duty to build the Prairie Meadows facilities adequately. That duty is found in the warranty provisions of Exhibit 69, section 4.5.1. However, the court concludes that Daly has failed to prove breach of that duty here. Expert testimony was presented that there were various leaks in the thermal barrier separating the soffits owing to gaps in the insulation and holes in the vapor barrier. However, because all of the evidence presented on this issue was obtained after the emergency efforts to clean up the damage caused by the burst pipes, and after any damage was inflicted by the bursting of the pipes, the court cannot find that the "as-built" conditions preceding the bursting of the pipes are ascertainable.

Daly also asserts that Weitz did not built what it said it would build for a thermal barrier between the warm and cold air soffits, therefore breaching a duty to build adequately. This argument is based on several details. First, Daly argues that Weitz's proposed change included interior wallboard. The court cannot read Exhibit 26, which is Sedlacek's letter proposing the change, as giving any indication that interior wallboard on the extension of the wall was intended. The letter specifies several elements of the extension of the wall to create the thermal barrier, including exterior sheathing, insulation, 3-½″ studs, and a vapor barrier. Sedlacek did not state that "the wall" would be extended upwards, as Daly argues, thus implying that all layers of the wall would be extended. Rather, Sedlacek wrote that studs slightly over half the thickness of the existing studs would be attached to the existing studs, thus extending the wall upwards. Then Sedlacek specifies each of the items that was to be mounted on the extended studs without any reference to interior wallboard.

Next, Daly argues that Weitz promised a continuous thermal barrier, but instead delivered one with air leaks. The court concluded above that the condition of the thermal barrier Weitz delivered cannot be ascertained from the evidence as the result of the damage caused by the bursting of the pipes and the subsequent efforts to clean up the damage. As a later addition to its argument, Daly asserted that Weitz failed to install the kinds of grills in the ceiling it originally suggested. Daly asserts that these grills were essential to air circulation in the soffits. Nonetheless, the evidence is clear that vents or grills were installed and that they permitted air circulation within the soffit.

The court concludes that, with one exception, neither party has shown an applicable duty or the invalidity of a contractual limitation of liability relevant to such a duty. The exception is the duty of Weitz to build adequately the soffits in question, and the court concludes that Daly has failed to prove breach of that duty. Nonetheless, even if the court could find an applicable duty in this case, and breach of that duty, the court concludes that no act or omission of these parties caused the harm to RACI that is the basis for this lawsuit. The court therefore turns to an analysis of the causation element of negligence in this case.

### C. Causation

Each of the experts who provided testimony as to the cause of the freezing and bursting of the pipes in the ceiling of the Prairie Meadows clubhouse identified a different cause. The court finds none of these opinions as to causation persuasive. *See Welte,* 482 N.W.2d at 442 (The trier of fact "is not required to believe the testimony of a witness," citing *Burger v. Omaha & Council Bluffs St. Ry. Co.,* 139 Iowa 645, 117 N.W. 35 (1908), and Iowa Civil Jury Instruction 100.9). The court notes first that none of the experts asserted that he was able to ascertain the condition of the soffit prior to the bursting of the pipes and clean up efforts, thus the court believes that each had to engage in some speculation as to those pre-accident conditions which make any of their conclusions suspect.

Although the actual cause of the harm here is obvious, the cold temperature of air within what was intended to be a warm air soffit, the experts disagree over the proximate cause or what condition was a substantial

factor in the presence of cold temperatures within the warm air soffit. Dr. Hall identified insufficient circulation of warm air resulting from inadequate design provisions for forcing warm air into the soffit as the cause. Dr. Kudder identified entry of cold air into the warm air soffit along various airpaths he believed were the result of inadequate construction of the thermal barrier. Mr. Bassler asserted that thermal conduction along structural steel that perforated the thermal barrier caused the chilling of the air in the warm air soffit, and that such perforation of the thermal barrier was a design flaw.

■■■ The court believes that none of these opinions takes proper account of the design provisions for forcing warm air into the soffit. The experts agreed that the thermal barrier alone could not prevent chilling of the warm air soffit under particular weather conditions, and that circulation of warm air into the soffit was also essential to prevent freezing of the sprinkler pipes. Because chilling of the air in the warm air soffit was inevitable, the design of the warm air soffit provided for warm air to be forced to circulate around the sprinkler pipes. The court finds that failure of any forced warm air to enter the soffit was not the result of a design flaw or construction flaw. Rather, it was the result of capping of the ductwork intended to force warm air into the ceiling area and failure to remove those caps during heating season. No party presented any evidence that it or its opponent suggested, intended, designed, or installed such caps for the ductwork extensions. Rather, the parties contemplated and installed dampered ductwork that could be opened or closed depending on the need for heating in the soffit. Plainly, the capped ductwork was not part of the design, and not a construction flaw attributable to the parties here. The capped ductwork failed to offset any infiltration of cold air as the result of inevitable thermal leakage, construction flaws, or design flaws.

The court doubts that any of the causes identified by the experts alone was a substantial factor in the freezing of the pipes. However, the court concludes that even if the leakage of cold air into the warm air soffit as the result of gaps in the thermal barrier, a construction flaw, or as the result of conduction along structural steel, a design flaw, was a substantial factor in causing the sprinkler pipes to freeze, the capping of the ductwork was a superseding cause sufficient alone to cause the air temperature in the soffit to fall below the freezing point. If an actor's conduct is not a substantial factor in bringing about the plaintiff's harm, or if it is a substantial factor but is superseded by later forces or conduct, then the actor's conduct does not constitute the legal cause of the plaintiff's harm. *Shaffer*, 395 N.W.2d at 857; *Schnebly v. Baker*, 217 N.W.2d 708, 729 (Iowa 1974). Therefore, the court concludes that neither party has proven that any act or omission by the other was the legal cause of the pipes freezing, and hence neither has proven the negligence of the other.

This conclusion precludes the necessity of the court apportioning fault under Iowa's comparative fault act or ordering any contribution. Consequently, the parties should be left as they now stand.

This result is no doubt unsatisfactory to both Daly and Weitz. The parties may rest assured that the result reached was not based on the court's desire to "split the difference"[7] or to avoid deciding difficult factual or legal issues. Rather, this result was mandated by the facts and the legal principles applicable to this litigation. This case echoes a simple truth. Litigation is often not a satisfactory dispute resolution mechanism. "Lawsuits consume time, and money, and rest, and friends."[8] It is unfortunate, perhaps troublesome, that Daly and Weitz have expended resources far exceeding the value of their respective claims in an effort to cast blame where legally there is none. The court notes that Daly and Weitz are both highly regarded giants in their respective trades. They have frequently worked to-

---

7. Of course, had the parties' crystal balls allowed them to predict this result at the beginning of the litigation, they might have heeded Ben Franklin's advice that "[r]ather split the Difference, tho' you lose one Half, than spend the Whole, entangled in the Law." Franklin, *Poor Richard's Almanack* (1750).

8. Herbert, *Jacula Prudentum*, No. 778 (1640).

gether on past projects and will, notwithstanding this litigation, undoubtedly work together on future projects. Daly and Weitz possess the economic resources to battle each other over the modest amount at stake here. However, many other litigants lack such resources and might benefit from Voltaire's reflection on his own litigation experience: "I was never ruined but twice: once when I lost a lawsuit, and once when I won one." [9]

## IV. CONCLUSION

The court concludes that there was either no applicable duty or no breach of an applicable duty by either of the parties, and thus the threshold showing of negligence has not been made in this case. As to the duty to provide an adequate design, the court finds that each party had limited by contract its liability for design flaws. Those limitations were not in violation of public policy, as they ran only to the party in privity, RACI, and did not in this case exempt the parties from liability for personal injury or death of a third party. Daly's duty to inspect and supervise construction was also limited by contract, and Daly failed to identify the source of any duty for Weitz to inspect or supervise construction. Although Weitz was under a duty to build adequately, owing to the inability of the parties to present evidence of the condition of the premises prior to the damage caused by the bursting of the pipes and the activities of the clean up crews, Daly failed to prove breach of that duty. Furthermore, Weitz's evidence demonstrated that it provided the instruction to the operators of the building required by its contract documents, and therefore it did not breach any applicable duty to instruct.

The court concludes that even if there was an applicable duty in this case, and breach of that duty by one or the other of the parties, the parties have failed to prove that breach was a legal or proximate cause of the freezing of the sprinkler pipes. Even if the leakage of cold air into the warm air soffit as the result of gaps in the thermal barrier, a construction flaw, or as the result of conduction along structural steel, a design flaw, was a substantial factor in causing the sprinkler pipes to freeze, the capping of the ductwork was a superseding cause sufficient alone to cause the air temperature in the soffit to fall below the freezing point. Neither party suggested, intended, designed, or installed capped ductwork. Therefore, neither party was responsible for the superseding cause. The court concludes that no apportionment of fault is appropriate under Iowa's comparative fault act in these circumstances, and therefore the parties will be left as they now stand.

**IT IS SO ORDERED.**

---

**9.** Herbert V. Prochnow & Herbert V. Prochnow, Jr., *A Treasury of Humorous Quotations, For* *Speakers, Writers and Home Reference* 3337 (1969).