WATERMAN, Justice
(dissenting).
I respectfully dissent for the reasons articulated in Justice Mansfield’s dissent, which I join. I write separately to elaborate on the purposes behind the attorney general certification procedure and the statutory immunities undermined by the majority today. The legislature provided our public officials certain immunities from suit under the Iowa Tort Claims Act (ITCA), Iowa Code ch. 669 (2011), and a straightforward, simple certification procedure to extricate state employees from lawsuits arising from the performance of their duties. Iowa Code §§ 669.5(2) (certification), 669.14 (immunities), 669.21 (defense and indemnity). The intent of the legislature was to allow our state employees to do their jobs without fear of the expense, distraction, and risk of personal financial ruin caused by lawsuits.
Certification not only spares the public official the risk of a ruinous personal judgment, but also the costs of defending a lawsuit. As Voltaire famously reflected, “ T was never ruined but twice: once when I lost a lawsuit, and once when I won one.’ ” Aetna Cas. & Sur. Co. v. Leo A. Daly Co., 870 F.Supp. 925, 941 (S.D.Iowa 1994). Until today, our public officials sued personally for doing their jobs could quickly avoid the cost of defending the suit upon the attorney general’s certification that they were acting within their scope of employment. The majority, however, remands this case to have the scope-of-employment issue determined by the fact finder, the jury. Significantly, under the majority’s interpretation, a plaintiff suing any state official can sidestep the attorney general’s certification merely by alleging the claim is brought against the defendant in his or her “individual capacity.” By alleging that simple phrase, the employee could be denied indemnification for ongoing defense costs. In effect, the majority creates an anticertification loophole that substitutes plaintiffs counsel for the attorney general to make the determination whether the defendant state employee must defend the lawsuit at his or her own expense. So now the state defendants are likely to remain personally entangled in costly litigation all the way through trial.
The majority asserts it is protecting the public fisc by sparing our state treasury the cost of defending lawsuits naming public officials in their individual capacity. *589 But, who decides at the threshold of a lawsuit whether the state employee was acting within the scope of his or her employment — the Iowa Attorney General, to whom the legislature entrusted this determination? Or Godfrey’s attorney, based on unproven allegations in the petition? Who is more likely to protect the public fisc? The attorney general, who is elected by the people of Iowa and accountable to the voters? Or a private lawyer for a claimant suing the State and state employees, whose attorney fee is contingent on a monetary recovery and increases with the size of the verdict or settlement? With good reason, our legislature enacted the certification procedure to empower the attorney general to decide the issue, with judicial review limited to cases where the attorney general refuses certification. See Iowa Code § 669.5(2); see also id § 13.2 (defining duties of attorney general).[5]
I predict the consequences of today’s decision will be to hamper job performance by state officials and to deter good people from public service. Why take a government job if your personal savings could be lost in a lawsuit? Why give a negative job performance evaluation of someone you supervise if he can sue you personally for defamation and take that case all the way to trial?
In this case, for example, the plaintiff has sued the Governor for making “false, defamatory statements to news organizations, including WHO-Radio and WHO-TV,” wherein the Governor “blamed Plaintiff for rising workers’ compensation costs for Iowa businesses.” Because it is important for public officials to communicate with the public, it has been the law for the last fifty years that defamation claims are not available against any public official who was acting in his or her official capacity. The attorney general, after independently reviewing the matter, found that the Governor was acting in his official capacity when he went on the radio and television to make these statements. The defamation claims were therefore dismissed, with the plaintiff being free to pursue his constitutional and discrimination claims. However, because the plaintiff included a bare allegation that the Governor was acting “individually and in his official capacity,” the majority now strips the attorney general of his authority, revives the plaintiffs defamation claims, and puts the Governor in the position of having to defend them.
This will create a strong incentive for public officials to clam up and not participate in press conferences or allow media interviews. Is this what we want? Is it what the legislature intended? It should *590 be noted that the decision in this case applies to all branches of government, including members of the general assembly. Allowing plaintiffs to sidestep the safeguards of the certification procedure will have a chilling effect on the willingness of state officials to answer questions about official actions or pending legislation. The price of the majority opinion will be less transparency and openness in our state government.
The majority ignores the admonitions our court reiterated just a few years ago on the important purposes served by immunities for public employees:
As recognized at common law, public officers require this protection [ (immunity) ] to shield them from undue interference with their duties and from potentially disabling threats of liability.
Without such protection, there is the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible, public officials in the unflinching discharge of their duties.
Hlubek v. Pelecky, 701 N.W.2d 93, 98 (Iowa 2005) (citations omitted) (internal quotation marks omitted); cf. Hook v. Trevino, 839 N.W.2d 434, 444 (Iowa 2013) (“We find it equally self-evident that the purpose of section 669.24 [volunteer immunity] is to encourage people to provide volunteer services to the state by removing the threat of personal liability.”). The certification procedure and accompanying immunities help our state officials execute their duties without being intimidated by the threat of personal liability. We should interpret the ITCA to effectuate that purpose, not undermine it. See Harden v. State, 434 N.W.2d 881, 884 (Iowa 1989) (“We seek a reasonable interpretation that will best effect the purpose of the [ITCA]....”); cf. Hlubek, 701 N.W.2d at 98 (recognizing the importance of protecting school officials from personal liability).
Federal courts likewise have echoed the importance of immunity for public officials:
The purpose of immunity is to protect “[t]he societal interest in providing such public officials with the maximum ability to deal fearlessly and impartially with the public at large.... The point of immunity for such officials is to forestall an atmosphere of intimidation that would conflict with their resolve to perform their designated functions in a principled fashion.”
El Dia, Inc. v. Rossello, 20 F.Supp.2d 296, 301 (D.P.R.1998) (quoting Clinton v. Jones, 520 U.S. 681, 693, 117 S.Ct. 1636, 1644, 137 L.Ed.2d 945, 960 (1997)), aff'd El Dia, Inc. v. Rossello, 165 F.3d 106, 108 (1st Cir.1999). The Wisconsin Supreme Court elaborated on the public policies underlying immunity for public officials:
These considerations have been variously identified in the cases as follows: (1) The danger of influencing public officers in the performance of their functions by the threat of lawsuit; (2) the deterrent effect which the threat of personal liability might have on those who are considering entering public service; (3) the drain on valuable time caused by such actions; (4) the unfairness of subjecting officials to personal liability for the acts of their subordinates; and (5) the feeling that the ballot and removal procedures are more appropriate methods of dealing with misconduct in public offic[e].
Lister v. Bd. of Regents, 72 Wis.2d 282, 240 N.W.2d 610, 621 (1976). Each of the foregoing public policies is undermined by today’s majority decision.
The district court correctly upheld the attorney general’s certification in this case *591 and dismissed the relevant claims against the defendants personally. I would affirm.
MANSFIELD, J., joins this dissent.

. As relevant, Iowa Code section 13.2 provides:
1. It shall be the duty of the attorney general, except as otherwise provided by law to:
a. Prosecute and defend all causes in the appellate courts in which the state is a party or interested.
b. Prosecute and defend in any other court or tribunal, all actions and proceedings, civil or criminal, in which the state may be a party or interested, when, in the attorney general’s judgment, the interest of the state requires such action, or when requested to do so by the governor, executive council, or general assembly.
c. Prosecute and defend all actions and proceedings brought by or against any state officer in the officer's official capacity.
d. Prosecute and defend all actions and proceedings brought by or against any employee of a judicial district department of correctional services in the performance of an assessment of risk.
e. Give an opinion in writing, when requested, upon all questions of law submitted by the general assembly or by either house thereof, or by any state officer, elective or appointive. Questions submitted by state officers must be of a public nature and relate to the duties of such officer.