Beverly A. EVANS, Administratrix of the Estate of Lewis E. Evans, Plaintiff-Appellee,

and

Dorothy Scholten, Administratrix of the Estate of Anthony Scholten, Plaintiff-Appellee,

v.

HOWARD R. GREEN COMPANY, Defendant and Third-Party Plaintiff-Appellant,

v.

DORY BUILDERS, INC., Third-Party Defendant and Fourth-Party Plaintiff-Appellant,

v.

CITY OF CEDAR RAPIDS, Iowa, Fourth-Party Defendant-Appellee.

Nos. 2–56401, 2–56402.

Supreme Court of Iowa.

July 31, 1975.

Rehearing Denied Oct. 10, 1975.

Keyes & Crawford, Cedar Rapids, and Charles T. Hvass of Hvass, Weisman & King, Chartered, Minneapolis, Minn., for Beverly A. Evans and Dorothy Scholten.

David F. McGuire, City Atty., for City of Cedar Rapids.

Donald T. Hines and John D. Randall, Cedar Rapids, for Howard R. Green Co.

Wayne C. Collins and Patrick M. Roby of Shuttleworth & Ingersoll, Cedar Rapids, for Dory Builders, Inc.

Heard before MOORE, C. J., and Le-GRAND, REES, REYNOLDSON and HARRIS, JJ.

HARRIS, Justice.

Louis E. Evans and Anthony Scholten lost their lives September 21, 1967 while working as construction employees at the water pollution control plant of Cedar Rapids, Iowa. Each died as a result of poisonous hydrogen sulfide gas. Separate wrongful death suits were brought by their estates (plaintiffs) and were consolidated for trial.

Sometime prior to June 1966 Howard R. Green Company (Green), an architectural and engineering firm located in Cedar Rapids, prepared plans and specifications for the 1966 improvement to the city's water pollution control plant. Green had prepared and supervised all plans and specifications for the building of the original installation and each of its subsequent improvements.

On July 13, 1966 Dory Builders, Inc. (Dory), a construction firm located in Minneapolis, Minnesota, entered into a contract to construct the improvements. The contract price was $1,910,494. The contract was written by Green.

Plaintiffs' action was brought against the City of Cedar Rapids and Green. The city was dismissed as a defendant under the theory of governmental immunity. Green's special appearance seeking dismissal under the governmental immunity theory was overruled. There was no appeal from either of these rulings.

Plaintiffs each claim Green was negligent in the design and preparation of specifications of the final sludge pumping station. These claims and Green's responses to them can be more appropriately detailed in a later division.

Green cross-petitioned against the contractor (Dory) claiming contractual indemnity for any damage incurred to plaintiffs. Dory cross-petitioned against the city claiming it was entitled to be indemnified by the city for any indemnity recovered against Dory by Green.

The case was tried to a jury which awarded damages of $135,000.00 to the es-

tate of Scholten and $175,000 to the estate of Evans. Over objection the issue of indemnity was also submitted to the jury which found in favor of Green on its claim of indemnity against Dory and against Dory on its claim of indemnity against the city. Green's and Dory's post-trial motions were denied. We affirm the trial court on the appeal of Green and reverse the trial court on the appeal of Dory. The question of Dory's right of indemnity becomes moot.

I. The first of Green's three assignments challenges instructions given and refused. Green's requested instructions and objections to instructions delineate Green's position on a disputed question of law. Our resolution of that question will be dispositive of Green's first assignment.

Green was found liable on a claim of negligence in designing the project. This assignment assails the trial court's view such a claim could arise as to the improvement before it was completed. It is Green's claim an architect can be charged with negligence in design only upon completion of that which he has designed. The trial court's instructions reflected its view of an earlier and broader exposure to liability.

More factual details are necessary in order to fairly consider these conflicting views. Taking the facts in the light most favorable to the verdict it appears the project expanding the facility called for addition of (1) three new primary clarifiers, (2) one new intermediate clarifier, (3) two new intermediate filters, (4) one new final filter, (5) a new final sludge building, (6) new sludge thickeners, (7) a new sludge pumping building, and (8) miscellaneous additions including new sewer lines.

Construction was begun shortly after the contract was signed and by September 21, 1967 all the work was completed except for installation of some fixtures and attending certain final details. It was necessary during the course of construction to keep the sewage plant in operation. Accordingly periodic meetings were held between Green,

Dory and the city to tailor the plant operating schedule to the construction schedule.

The accident occurred in the final sludge building. This building is divided into two parts: the wet well side and the dry well side. Door entrances for both the wet and dry well sides were at ground level.

The dry well side contained pumps capable of pumping sludge to various parts of the facility. The wet well side was divided into two parts by a wall from the bottom of the well to ground level, about 18½ feet. The division of the wet well left it in two compartments. One of the two compartments in the wet well was for sludge. This sludge was removed from sewage at various points and would flow by gravity into the compartment on the wet well side. From there it could be pumped to whatever part of the facility necessary.

The other compartment in the wet well side received effluent (clear liquid) which was either circulated by pumps to other points in the system or into a nearby river.

There was one exhaust fan for both wet and dry wells. The fan was designed to exhaust the dry well by reducing pressure in the wet well. The air in the dry well side would exhaust through a duct located on the dry well side of the dividing wall. From there the air would go into the wet well side. This opening (in the dividing wall) was below ground level. There was a slotted louver on the wet well side of this opening which was designed to prevent air from backing up from the wet well side into the dry well side. Such prevention is of crucial importance because it is well known sludge under certain circumstances can form the poisonous gas hydrogen sulfide.

Additionally the design of the final sludge building called for two hinged ventilators or windows in the dividing wall. There are three ways the windows could be opened. Handles could be turned at the top of each window. If the handles were not in the closed position the windows could be opened by pushing them from the platform in the wet well section. Finally by use of

an extension rod the windows could be opened from the dry well pit or by standing opposite the ventilators on the well platform.

During the six days prior to the accident the final sludge building had been in operation but some difficulties had been encountered. Concern was raised over an obvious defect in the design. The original plans had not provided for the escape of sludge entering the sludge wet well by gravity in case of pump failure or blockage in the lines. To compensate for that failure an overflow opening was decided upon between the sludge compartment and the effluent compartment of the wet well.

Green's resident engineer ordered Dory to cut such an opening in the wall between the sludge side and effluent side. This work was performed in the morning and afternoon of September 21, 1967. Because of this sludge backed up causing it to go into anaerobic decomposition which resulted in the formation of hydrogen sulfide gas. The evidence showed a low concentration of this gas has the smell of rotten eggs but at higher concentration it is odorless because it immediately paralyzes the olfactory nerve. When the work was completed September 21 the pumps were turned on and the sludge began to flow.

In accordance with the specified working arrangement between Green and Dory a conference was held after work on September 21 concerning a prefabricated stairway in the dry well. Attending this meeting were Carl Dorenkemper (president of Dory), the decedent Lewis Evans (Dory's construction superintendent), the decedent Anthony Scholten (Dory's carpenter foreman), and Patrick McGuire (Green's resident engineer and inspector). The group needed a copy of the shop drawings and Scholten went to the pit of the dry well to obtain them. When he failed to return Evans went to investigate. Evans returned to report his belief Scholten had fallen into the dry well. An ambulance was summoned and Evans and McGuire returned to help Scholten.

When Dorenkemper and the ambulance driver arrived they found all three men, Scholten, Evans and McGuire, lying at the foot of the ladder in the dry well. The windows between the wet and dry wells were open with electric lines running through them. The electric lines had been so placed in order to cut the overflow opening between the two chambers of the wet well. Although an exhaust fan was already installed it was not yet in operation since electrical hookup was not yet completed. Scholten and Evans were dead on arrival at the hospital as a result of hydrogen sulfide poisoning.

Green is wrong in suggesting an architect's duty to exercise reasonable care lies suspended during construction operations and becomes binding and enforceable only when construction is completed. We rejected such a view in *McCarthy v. J. P. Cullen & Son Corp.*, 199 N.W.2d 362 (Iowa 1972). In McCarthy the claim was for property damages to a neighbor of the architect's client. We said:

"Plaintiffs alleged the architect furnished defective and inadequate plans and specifications which failed to provide properly for drainage of surface water. As we understand the architect's argument, it goes like this: This damage occurred during construction; the plans and specifications were not designed to provide for drainage of the building site until the project was complete; the plans and specifications were correct and accurate for their intended purpose. As a corollary the architect insists the obligation for 'all safety precautions and programs until such time as the project was completed' rested solely and entirely with the contractor.

" * * *.

"We cannot agree defendant architect can so easily wish off his duty to the public generally for harm resulting from negligence in furnishing plans and specifications which cause damage during the work itself. We reject the ingenious and startling theory that a person can, by contract with a

third party, lay down his own rules as to when he will be liable to those whom his negligence injures.

"If defendant architect negligently prepared plans and specifications and if plaintiffs were thereby damaged, defendant architect—like everyone else—is responsible for the consequences of that negligence. This is what the trial court instructed, and we believe it did so correctly." 199 N.W.2d at 370.

Our view seems to be in accord with the law generally. We note and approve the following:

"An architect may be held liable for negligence in failing to exercise the ordinary skill of his profession, which results in the erection of an unsafe structure *whereby anyone lawfully on the premises* is injured. An architect's liability for negligence resulting in personal injury or death may be based upon his supervisory activities or upon defects in the plans. The liability of the architect, moreover, is not limited to the owner who employed him; the modern view is that privity of contract is not a prerequisite to liability. * * *." (Emphasis added.) 5 Am.Jur.2d, Architects, § 25, page 688. See also Annot., 59 A.L.R.2d 1084; Sobel, Architect Tort Liability in Preparation of Plans and Specifications, 55 Cal.L. Rev. 1361, 1372.

Plaintiffs offered evidence of what was referred to at trial as the Ten State Standards. These were promulgated by Great Lakes-Upper Mississippi River Board of State Sanitary Engineers to provide guidelines for the design and specifications of sewage plants. Iowa is one of the ten states.

■ According to the standards in force when Green drew up this improvement it was provided in § 32.21: "Separation—Wet and dry wells including superstructure shall be completely separated." § 32.7 stated: "Ventilation— * * * There shall be no interconnection between the wet well and dry well ventilating systems. * * *." Evidence of violation of a private safety

code, such as the Ten State Standards, is admissible as evidence of negligence but is not conclusive to prove negligence. *Jorgensen v. Horton,* 206 N.W.2d 100, 103 (Iowa 1973).

■ The trial court properly found plaintiffs made out a jury question on Green's negligence in designing the improvement. The jury could and obviously did find Green was negligent in designing the final sludge pumping station by failing to completely separate the wet and dry wells and to thereby permit lethal gas to seep from one well to the other. Green is wrong in insisting no duty in regard to such design was owed Dory's employees. Green was aware the plant would be in operation during the construction. Indeed Green was involved in correlating the progress of construction with operation of the plant.

" * * * The almost universal use of the phrase 'due care' to describe conduct which is not negligent, should not be permitted to obscure the fact that the real basis of negligence is not carelessness, but behavior which should be recognized as involving unreasonable danger to others." Prosser on Torts (Fourth Ed.) § 31, page 145.

■ Green's duty extended to all persons lawfully on the premises. The duty is not obviated, as Green suggests, by any separate duty Dory may have owed their decedent employees. Cf. *Cronk v. Iowa Power & Light Co.,* 258 Iowa 603, 138 N.W.2d 843 (1966).

Green's first assignment is without merit.

II. Green's second assignment of error challenges a ruling of the trial court which allowed plaintiffs to offer, by way of rebuttal evidence, the deposition of the witness Francis Yock. Yock had been employed by the City of Cedar Rapids as maintenance man at the sewage plant and assisted in the operation of the pumps at the sludge pumping station in the days just prior to the accident.

In a deposition taken December 2, 1972 Yock described the operation of the pumps

and various other matters. The deposition contained a recitation that the witness did not recall being instructed by a Mr. Eldon DeCamp regarding gas hazards. DeCamp was called by Green and testified he had so instructed Yock. Thereafter Dory presented its case in chief and as a part of its case indicated Yock would be called as a witness. At the request of Dory's counsel a subpoena was issued and delivered to the sheriff's office with the request that Mr. Yock be served therewith. No service was obtained over Yock.

Thereafter, immediately following Christmas trial recess, plaintiffs' counsel for the first time were advised Yock would not be called by Dory. Plaintiffs' counsel immediately called the Yock home and learned Yock would be unavailable to appear as a witness because he would not return home on either the 26th or 27th. Plaintiffs were required to proceed with rebuttal testimony on the 26th and Yock was to be their only rebuttal witness.

Rule 144(c), Rules of Civil Procedure, allows the reading of a deposition at trial:

"For any purpose, if the court finds that the offeror was unable to procure deponent's presence at the trial by subpoena; or that deponent is out of the state or more than one hundred miles distant from the trial, and such absence was not procured by the offeror; or that deponent is dead, or unable to testify because of age, illness, infirmity or imprisonment."

Green claims rule 144(c) did not allow reading Yock's deposition because there was no showing plaintiffs' counsel were unable to procure deponent's presence at the trial. Plaintiffs cite *Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632, 652 (Iowa 1969). In Schmitt we held: "Unavailability of the deponent as well as admissibility of a deposition is to be determined by the court and depends generally upon the conditions which exist at the time it is offered. (Authorities)."

■ We believe the trial court acted properly in allowing the reading of the dep-

osition. Green does not challenge the fact the witness was unavailable on the day plaintiffs presented rebuttal evidence. Neither does Green contest counsel's assurance he first learned of Yock's absence on December 26. Green's second assignment is without merit.

III. Green's final assignment is addressed to a trial court ruling denying a motion for mistrial.

Green's project engineer was called as a witness by plaintiffs. During cross-examination Dory's counsel inquired into the amount Green was paid by the city for services on the project. The witness was asked what out of pocket costs the city would pay Green. The following then occurred:

"A. Actual out of pocket costs would include salary items in this particular case as has been indicated, myself and the resident inspector and any supporting people in the office, clerical, typing, whatever support was required, telephone costs, insurance, workmen's comp and the usual overhead items and as you indicated, travel if there were travel.

"Q. Would liability insurance be included as out of pocket costs?"

At this point Green's counsel objected and moved for mistrial on the complaint Dory's attorney brought liability insurance before the jury. Green argues the jury therefore became prejudiced with regard to Green.

■ The motion for mistrial was properly overruled. It remains true in a personal injury or death action evidence is generally inadmissible which informs the jury a defendant is insured against liability. It is generally improper for the subject of liability insurance to be raised in any way before the jury. However it is no longer true that we will presume prejudice if the jury learns or is given reason to suspect an insurance company is interested in the result of the trial. We expressly rejected such a rule in *Price v. King*, 255 Iowa 314, 321–322, 122 N.W.2d 318, 322–323 (1963). There are cir-

cumstances under which such evidence is admissible. *Mihalovich v. Appanoose County*, 217 N.W.2d 564, 567 (Iowa 1974) and authorities.

Although the subject of liability insurance is irrelevant in this trial we believe the trial court's ruling on the motion for mistrial was proper for a number of reasons. The subject was inadvertently entered into the case by the witness rather than the attorney. The attorney's reference was an expansion on an answer previously given by the witness. The subject was raised by one defendant and the motion for mistrial was made by another defendant. Finally the question asked was never answered. We believe the trial court acted well within its discretion in overruling the motion for mistrial.

Because all three of Green's assignments are found to be without merit we affirm on Green's appeal.

IV. Dory appeals the action of the trial court in submitting the question of contractual indemnity to the jury and from a judgment in favor of Green for the amount recovered by plaintiffs. Dory's first contention is that the matter should not have been submitted to the jury but should have been determined by the court. We agree.

Green claims its right of indemnity from Dory by way of express contract. The contract was entered July 13, 1966 between Dory and the city and was written by Green. It provided for construction of the improvement in accordance with specifications prepared by Green. Three provisions of the specifications pertained to the responsibility in case of accident. They were as follows:

"ITEM 20. RESPONSIBILITY FOR ACCIDENTS. The Contractor shall assume full responsibility for all damages sustained by person or property *due to the carrying on of his work*, and until final acceptance thereof, or until released by the Engineer in writing.

"ITEM 21. LIABILITY INSURANCE. No construction work shall be started under this contract until the insurance requirements hereinafter stated have been satisfied. The Contractor shall carry liability insurance which shall save harmless the Owner, protect the public and any person from injury sustained *by reason of the prosecution of the work or the handling or storing of materials therefor*, and said Contractor shall also carry liability insurance which shall meet the requirements of Iowa Workmen's Compensation Law.

"The contractor shall furnish the Owner with proper affidavit or affidavits executed by representative of duly qualified insurance companies, evidencing that said insurance company or companies have issued liability insurance policies effective during the life of the contract, protecting the public or any person from injury or damages *sustained by reason of carrying on the work involved in the contract.* The affidavit shall *specifically evidence* the following forms of insurance protection.

"1. Liability insurance covering all *operations performed by persons directly employed by the Contractor.*

"2. Public liability insurance covering *all operations performed by any subcontractor* to whom a portion of the work may have been assigned.

"3. Public liability insurance covering all work on the project *performed by an independent contractor* working under the direction of either the principal contractor or a subcontractor.

"4. Motor vehicle bodily injury liability insurance and property damage liability insurance on all motor vehicles employed on the work, whether owned by the Contractor or by other persons, firms or corporations.

"ITEM 37. CONTRACTOR'S RESPONSIBILITY. In the event of any suit against the Owner, its officers, engineers, or employees *on account of any alleged act or omission of the Contractor*, the Contractor shall defend said suits and shall pay any and all judgments or settlements resulting therefrom and failing so to do, any judgments against or settlements made on

account thereof shall become a lien against any funds due the Contractor and may be held by the Owner from any funds due the Contractor." (Emphasis added.)

■ Indemnity contracts are subject to the usual rules governing their formation, validity and construction. 41 Am.Jur.2d, Indemnity, § 6, page 691.

We recently had occasion to deal with the question of whether contractual interpretation or construction should be determined by a court or jury. We said:

"Although we have frequently used the terms 'interpretation' and 'construction' interchangeably, they have a distinct technical significance which in jury cases affects whether a particular contract problem is an issue for the jury or for the court. Interpretation, the meaning of contractual words, is an issue for the court unless it depends on extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence. (Authorities). Construction, the legal effect of a contract, is always a matter of law to be decided by the court. (Authorities)." *Connie's Const. v. Fireman's Fund Ins.*, 227 N.W.2d 207, 210 (Iowa 1975).

■ The question of Green's right to indemnity against Dory was a matter of construction and clearly one which should have been decided by the court and not submitted to the jury.

■ V. Since the effect of the indemnity contract is a legal determination it does not appear the question should be remanded for further proceedings. Dory and Green both urge their views of such effect. Both have fully presented their showing in connection with their views. Under the circumstances it is appropriate for us to determine the indemnity question and direct final judgment accordingly. See *Hartman v. Kruse*, 249 Iowa 1320, 91 N.W.2d 688 (1958).

■ VI. It might be noted Green's position may well be untenable under the rule an indemnity agreement generally will not be construed to cover losses to the indemnitee caused by his own negligence. In order to do so the agreement must be clear and unequivocally expressed. General, broad and all-inclusive language is insufficient for the purpose. 15 Williston on Contracts, § 1750A, page 143. See also 41 Am.Jur.2d, Indemnity, § 15, pages 699–700; 42 C.J.S. Indemnity § 5, page 569 and § 12, page 580; Annot., 27 A.L.R.3d 663, 716 et seq.

■ In claiming the benefit of the provisions of the contract in question Green stands as the indemnitee. Green drew the specifications, drew and administered the contract through which the right of indemnity is claimed. See *Sears, Roebuck and Co., Inc. v. Poling*, 248 Iowa 582, 81 N.W.2d 462 (1957); 17 C.J.S. Contracts § 262, pages 1160–1161.

Although Green might well be barred from claiming the right of indemnity under the foregoing rule we rely on the limitations of the contractual provision itself.

VII. Plaintiffs' cause was based on a theory of negligent design only. As submitted there was no claim of negligence as to any act following the commencement of work by Dory. Yet under the indemnity provision any right of indemnity against Dory had to be "due to the carrying on of his (Dory's) work." There is nothing to suggest the provision was intended to indemnify for any past negligent acts of the city's engineer architect in designing the project which might result in future accidents such as the one which later precipitated these suits.

■ "Usually a contract of indemnity covers only losses or liabilities which are incurred after the execution of the contract, and not a loss or liability which had been incurred prior to the execution of the contract, unless it plainly manifests an intention, not to be limited to future losses or liabilities, but also to cover past transactions and existing losses or liabilities.

\* \* \*." 42 C.J.S. Indemnity § 12b, page 581.

██ The party claiming indemnity must plead and prove its right to recover. *McCarthy v. J. P. Cullen & Son Corp.*, 199 N.W.2d 362, 371 (Iowa 1972). Green has failed to prove such a right.

VIII. The jury determined the accident resulted from Green's negligent design. Green proceeded against Dory on the basis of contractual indemnity. This was the sole theory submitted (wrongly) to the jury on Green's claim against Dory.

Separately, and somewhat inconsistently, Green seeks to justify the indemnity recovery against Dory on a theory of primary responsibility. See *Weidert v. Monahan Post Legionnaire Club*, 243 Iowa 643, 51 N.W.2d 400 (1952). We overlook our serious reservations as to whether this question is properly preserved or presented.

██ The right to indemnity, even in the absence of express contract, against one primarily responsible for a wrong is generally recognized against contractors. 41 Am. Jur.2d, Indemnity, § 24, pages 714–717; Annot., 97 A.L.R.2d 616. However the doctrine has no application to the facts presented in the case before us. In the instant case Dory had nothing at all to do with the wrong for which recovery was sought and obtained: negligent design.

██ In any event such an indemnity right is generally denied a contractee who actively participates in the control or supervision of the work. *Cahill Bros., Inc. v. Clementina Co.*, 208 Cal.App.2d 367, 25 Cal. Rptr. 301 (1962); *Good Neighbor Federation v. Pathe Industries*, 202 Misc. 951, 141 N.Y.S.2d 365; affd. 281 App.Div. 968, 120 N.Y S.2d 925 (1952).

██ Green did so participate through its resident engineer in accordance with express provisions in the contract.

Indemnity from Dory on a theory of primary responsibility is unavailable to Green.

It follows the case must be reversed on the appeal of Dory. Dory's other claims, including those involving a claim of indemnity by Dory against the city, become moot.

Affirmed on the appeal of Green. Reversed on the appeal of Dory. Remanded with directions to enter judgment for plaintiffs against Green and dismissing all claims for indemnity. Costs are taxed to Green.