TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN




NO. 03-09-00518-CV




Black + Vernooy Architects, J. Sinclair Black, and D. Andrew Vernooy, Appellants

v.

Lou Ann Smith; Jimmy Jackson Smith, Individually and as Next Friend of Rachel and
Grayson Smith; and Karen E. Gravely, Appellees




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. D-1-GN-06-002615, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING


 
O P I N I O N

                        Appellees Lou Ann Smith, Jimmy Jackson Smith, individually and as next friend of
Rachel and Grayson Smith, and Karen E. Gravely sued appellants Black + Vernooy Architects,
J. Sinclair Black, and D. Andrew Vernooy (collectively, “BVA”) for negligence in connection with
injuries suffered by Lou Ann Smith and Karen Gravely when the second-floor balcony of a friend’s
home collapsed while they were standing on it. A jury found that the injury was proximately caused
by the negligence of (1) BVA, the architects who designed the home, (2) the general contractor who
built the home, and (3) the framing subcontractor who installed the balcony. The jury attributed 70%
of the responsibility to the general contractor, 20% to the subcontractor, and 10% to BVA. BVA
now appeals, arguing that the jury’s verdict was based on legally insufficient evidence. We affirm
the judgment.
 
BACKGROUND
                        In October 2000, Robert and Kathy Maxfield hired BVA to design a vacation home
for them on Inks Lake, outside of Burnet, Texas. In addition to an $84,000 fee for design services,
the Maxfields paid BVA a $16,800 fee to provide “contract administration services” during the
construction of the residence. The agreement to provide contract administration services stated that
BVA would, among other things, “endeavor to guard the Owner against defects and deficiencies in
the Work.” Sinclair Black, a senior architect, and J.C. Schmeil, an intern architect, designed the
Maxfields’ residence and prepared the construction drawings and specifications on behalf of BVA.
The general contractor, Nash Builders, Inc. (“Nash”), began construction in October 2001, and
completed construction of the home in May 2003. 
                        On July 19, 2004, Gravely and the Smith family were visiting the Maxfields at the
Inks Lake residence when, at some point during the visit, Gravely and Lou Ann Smith stepped out
onto the upstairs balcony. A few seconds later, the balcony separated from the exterior wall of the
home and collapsed, causing the two women to fall approximately twenty feet to the ground. Lou
Ann Smith was rendered a paraplegic as a result of the injuries she suffered in the fall, while Gravely
suffered a broken finger, a crushed toe, and multiple bruises.
                        Gravely and the Smiths sued the Maxfields, Nash, and BVA for negligence in
connection with the collapse of the balcony. Nash and the Maxfields settled prior to trial, and a jury
trial was held on the issue of BVA’s liability. Black, Schmeil, and expert witnesses for both sides
testified at trial that as constructed, the balcony contained a number of defects and deviations from
the construction design drawings prepared by BVA, which detrimentally affected the structural
integrity of the balcony and ultimately led to its collapse. First, the design drawings required that
the metal pipes supporting the balcony be welded to steel plate tabs, which would then be bolted to
the balcony. As constructed, however, the metal support pipes were attached to the balcony using
thin metal clips. The plaintiffs’ expert witness, John Allen Pierce, testified that the clips used to
attach the support pipes to the balcony were a type generally used to support “light-weight items such
as electric conduit or plumbing piping.” Second, the design drawings required that a metal support
piece, referred to as a “joist hanger,” be used to reinforce the attachment of each of the balcony joists
to the exterior wall of the house. In the actual construction of the balcony, however, no joist hangers
were used.


 Third, the balcony handrail was not bolted to the house as required by the design
drawings. Finally, and most importantly, the drawings called for the balcony to be attached to the
exterior wall of the house by bolting it to an inch-and-a-half thick rim joist and another inch and a
half of wood blocking. Despite these specifications, the balcony was not attached to the house using
bolts, a rim joist, and blocking, but was instead nailed to a half-inch of plywood. It is undisputed
that neither Schmeil nor Black identified any of these defects and deviations from their design
drawings or brought them to the attention of the owner or general contractor.
                        Black testified that in the course of providing contract administration services, BVA
was required to make periodic visits to the site while the home was under construction to, among
other things, observe the construction and determine whether it was in compliance with the
construction documents. During certain site visits, Schmeil took photographs of the balcony, which
were entered into evidence. Black testified that he had reviewed Schmeil’s photographs to determine
if the balcony was built “[i]n compliance with the design intent,” but that he did not notice the
defects or deviations from the design drawings that he and Schmeil had prepared. Looking at these
photographs during his testimony, Black testified that they depicted that the handrail was not
connected to the wall as required, the metal support pipes were not attached with welded and bolted
tabs as required, joist hangers had not been used as required, and the balcony was not bolted to the
house in the manner required by the design drawings. Black further testified that the absence of the
required rim joists and welded tabs was obvious from the photographs.
                        Black also testified that a photograph Schmeil had taken from the interior of the house
depicted plywood where the rim joist and blocking should have been. Black acknowledged that at
the stage of the framing process depicted in the photograph, the rim joist should have been in place
and visible, and that the rim joist was critical to the structural integrity of the balcony. When asked
whether the absence of the rim joist was open and obvious at the time BVA reviewed the
photographs, Black answered, “It’s obvious now. We didn’t notice.” Black stated that if he had
noticed the defects visible in the photographs, he “absolutely” would have requested that the
contractor correct them. When asked, “And I assume no one in the world knew the plans, the
drawings[,] and what this balcony should look like any more than you; is that true, sir?” Black
answered, “Well, J.C. Schmeil and I.” Black further testified that when he designed the balcony,
“safety and structural integrity were an extremely important part of it.” 
                        Black also testified regarding photographs he had taken after construction was
completed, at least one of which had appeared on BVA’s website. Looking at a photograph taken
of the balcony after construction was complete, Black testified that the balcony defects depicted in
Schmeil’s photographs remained in place. 
                        Pierce, the plaintiffs’ expert witness and a licensed architect for 49 years, testified that
a reasonable and prudent architect would have identified the balcony defects at the time Schmeil’s
photographs were taken, brought them to the attention of the general contractor, and required that
they be corrected.


 Pierce further testified that the defects “should have been observed” because the
required elements were “clearly missing.” In reviewing the photographs taken by Schmeil, Pierce
stated that the defects were “open and obvious” and “not hidden at all.” Like Black, Pierce testified
that the presence of the rim joist was critical to the structural integrity of the balcony, and that the
absence of the rim joist and blocking was obvious from the photographs. Pierce also testified that
as an architect, he would “certainly be looking at the [details] that affected the structural integrity
of the house.” When asked, “Does the fact that . . . the structural integrity of this balcony is critical,
does that have something to do with a reasonable and prudent architect’s duty to examine the
balcony?” Pierce answered, “Certainly,” further explaining that the observation of structural defects
in a balcony would be critical in endeavoring to guard an owner against defects in the work.
                        BVA’s expert witness, John Nyfeler, a licensed architect for 39 years, testified that
it would be possible for an ordinarily prudent architect providing contract administration services
to overlook the absence of a rim joist, although he stated that the lack of a rim joist was obvious in
the photographs. Nyfeler also opined that an ordinarily prudent architect “might have overlooked”
the use of clips, rather than welded tabs, to attach the metal support pipes to the balcony. 
Nyfeler acknowledged on cross-examination that because the safety of a balcony is a critical matter,
a reasonable and prudent architect should pay special attention to a balcony’s structural integrity
during the contract administration process. Nyfeler also testified that in providing contract
administration services, an architect is “expected to make periodic visits to the project site to observe
the work of the contractor,” “to endeavor to protect the owner against the deviations and
defects in the work,” and “to call to the owner’s attention deviations that he observes in . . . the
quality of the work.” 
                        For purposes of comparison, the jury was presented with photographs depicting how
the welded and bolted tabs attaching the metal support pipes to the balcony would have looked if
they had been used as required, as well as photographs depicting the use of joist hangers in other
areas of the residence. The jury also heard evidence that BVA had identified a number of defects
in other parts of the residence during the construction process, and that it had required Nash to
correct them.



The Contract
                        The contractual agreement between the Maxfields and BVA consisted of a standard
document used in the construction industry, American Institute of Architects (AIA) Document B151-1997, Abbreviated Standard Form of Agreement Between Owner and Architect. With respect to the
provision of contract administration services, the contract included the following language:
 
2.6.5 The Architect, as a representative of the Owner, shall visit the site at intervals
appropriate to the state of the Contractor’s operations, or as otherwise agreed by the
Owner and the Architect in Article 12, (1) to become generally familiar with and to
keep the Owner informed about the progress and quality of the portion of the Work
completed, (2) to endeavor to guard the Owner against defects and deficiencies in the
Work, and (3) to determine in general if the Work is being performed in a manner
indicating that the Work, when fully completed, will be in accordance with the
Contract Documents. However, the Architect shall not be required to make
exhaustive or continuous on-site inspections to check the quality or quantity of the
Work. The Architect shall neither have control over or charge of, nor be responsible
for, the construction means, methods, techniques, sequences or procedures, or for
safety precautions and programs in connection with the Work, since these are solely
the Contractor’s rights and responsibilities under the Contract Documents.
 
2.6.6 The Architect shall report to the Owner known deviations from the Contract
Documents and from the most recent construction schedule submitted by the
Contractor. However, the Architect shall not be responsible for the Contractor’s
failure to perform the Work in accordance with the requirements of the Contract
Documents. The Architect shall be responsible for the Architect’s negligent acts or
omissions, but shall not have control over or charge of and shall not be responsible
for acts or omissions of the Contractor, Subcontractors, or their agents or employees,
or of any other persons or entities performing portions of the Work.

            . . . .
2.6.10 The Architect shall have authority to reject Work that does not conform to the
Contract Documents. Whenever the Architect considers it necessary or advisable,
the Architect shall have authority to require inspection or testing of the Work in
accordance with the provisions of the Contract Documents, whether or not such
Work is fabricated, installed or completed. However, neither this authority of the
Architect nor a decision made in good faith either to exercise or not to exercise such
authority shall give rise to a duty or responsibility of the Architect to the Contractor,
Subcontractors, material and equipment suppliers, their agents or employees or other
persons or entities performing portions of the Work.
 
 
                        Black testified that he considered contract administration services to include making
periodic site visits to observe the progress of the work, endeavoring to protect the owner against
defects and deficiencies, checking the accuracy and fairness of the general contractor’s pay requests,
trying to make sure the home is built in compliance with construction documents, and checking shop
drawings against the design intent. Black further testified that in performing contract administration
for the Maxfields, BVA averaged two visits to the construction site per month. Despite the contract
language and Black’s testimony that BVA was required to endeavor to guard the Maxfields against
defects and deficiencies in the work as part of the contract administration process, Schmeil testified,
“I believed my responsibility was to endeavor to see that construction was proceeding according to
the construction drawings, but not to specifically look for defects in the construction.” Schmeil also
acknowledged that in his deposition testimony, he maintained that he had not been looking for
structural defects in the balcony, as his responsibility with respect to the balcony was limited to
making “sure that it was the correct size and under the proper door opening.”


 BVA’s agreement to perform contract administration for the Maxfields also required
BVA to approve Nash’s applications for payment. After approving each application, BVA submitted
certificates for payment to the Maxfields, which included the following language: 
 
In accordance with the Contract Documents, based on on-site observations and the
data comprising the above-referenced Application for Payment, the Architect certifies
to the Owner that to the best of Architect’s knowledge, information, and belief, the
Work has progressed as indicated, the quality of the Work is in accordance with the
Contract Documents, and the Contractor is entitled to payment of the Amount
Certified, including overage as described in documents provided by the Contractor.


 
 
 
Black testified that one of the reasons periodic site visits are required during the contract
administration process is to facilitate the architect’s certification of the contractor’s pay applications.
                        The contract further provided that BVA was to issue the final certificate for payment
“based upon a final inspection indicating the Work complies with the requirements of the Contract
Documents.” It is undisputed that no final inspection was conducted, although there was conflicting
testimony as to the reason for this omission. Black testified that the inspection process was to be
triggered when the contractor called for a date of substantial completion, and that because Nash
never notified him of a date of substantial completion, BVA never conducted the required inspection. 
Black also testified that he stopped providing contract administration services to the Maxfields after
his last visit to the construction site in January 2003, because he received a phone call from Robert
Maxfield, who stated, “I think Steve Nash and I can handle it from here on out.” Black interpreted
this to mean that he would not be expected to conduct the final inspection. When asked about this
discussion, Steve Nash testified, “No, that’s not true,” further stating that he remembered BVA being
involved through completion of the project.


 In any event, Black testified that the absence of the
required rim joist where the balcony was attached to the house would not have been observable
in the final inspection because the area would have been covered by finished elements such as
walls and ceilings. 
                        The jury heard evidence that Nash was required by its contract with the Maxfields to
notify BVA and obtain approval for any changes to the original design of the residence. The balcony
design drawings, which were entered into evidence, included the following notation: “Installation
or completion of building elements in direct conflict with intent of drawings (as expressed in
architectural documents) will not be acceptable without written approval from architect.” It is
undisputed that no such approval was requested or provided for any of the deviations from the
balcony design.
                        After hearing the evidence, the jury found that the plaintiffs’ injuries were
proximately caused by the negligence of BVA, Nash, and Rodriguez, attributing 70% of the
responsibility to Nash, 20% to Rogriguez, and 10% to BVA. Based on the jury’s findings related
to damages and proportionate responsibility, as well as adjustments for medical expenses actually
paid, the trial court rendered judgment that the Smiths recover a total of $380,749.19 from BVA,
plus prejudgment interest, and that Gravely recover nothing from BVA.


 This appeal followed.

STANDARD OF REVIEW
                        When reviewing a jury finding for legal sufficiency, we must credit evidence
favorable to the judgment if a reasonable factfinder could, disregard contrary evidence unless a
reasonable factfinder could not, and reverse the factfinder’s determination only if the evidence
presented in the trial court would not enable a reasonable and fair-minded factfinder to reach the
judgment under review. City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). We will sustain
a legal sufficiency challenge if the record reveals: (1) the complete absence of evidence of a vital
fact; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence
offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere
scintilla; or (4) that the evidence conclusively establishes the opposite of a vital fact. See id. at 810.
More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable
and fair-minded people to differ in their conclusions. Ford Motor Co. v. Ridgway, 135 S.W.3d 598,
601 (Tex. 2004). As the finder of fact, the jury is the sole judge of the credibility of the
witnesses and the weight to be given their testimony. McGalliard v. Kuhlmann, 722 S.W.2d 694,
696 (Tex. 1986). 
 
 
DISCUSSION
                        In a single issue on appeal, BVA argues that there is legally insufficient evidence to
support the jury’s finding that it was negligent because BVA did not have a duty to Gravely and the
Smiths to identify the balcony defects and bring them to the Maxfields’ attention. BVA’s argument
can be broken down into two parts. First, it argues that it had no duty to identify the balcony defects
shown in the photographs taken by Schmeil. Second, it argues that if such a duty did exist, it was
owed only to the Maxfields and does not extend to foreseeable visitors to the home. We will address
both issues in turn.

Existence of a Duty
                        BVA contends that its contractual obligation to “endeavor to guard” the Maxfields
against defects and deficiencies in the work did not constitute a duty to identify defects in the
structural integrity of the balcony unless those defects were actually observed. Nyfeler, BVA’s
expert witness, testified that regardless of how open, obvious, dangerous, or observable a defect is,
an architect providing contract administration services who does not actually observe the defect has
no duty to bring it to the owner’s attention. Under the circumstances presented here, we disagree. 
See Nabors Drilling, U.S.A., Inc. v. Escoto, 288 S.W.3d 401, 403 (Tex. 2009) (holding that existence
of duty is question of law for court to decide).
                        A defendant may be liable for negligence only to the extent that it owed the plaintiff
a legal duty. See Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 782 (Tex. 2001). The
question of whether a legal duty exists requires the balancing of “factors such as the risk and
foreseeability of injury, the social utility of the actor’s conduct, the consequences of imposing the
burden on the actor, and any other relevant competing individual and social interests implicated by
the facts of the case.” Texas Home Mgmt., Inc. v. Peavy, 89 S.W.3d 30, 33 (Tex. 2002). A contract
for professional services gives rise to a duty by the professional to exercise the degree of care, skill,
and competence that reasonably competent members of the profession would exercise under similar
circumstances. Dukes v. Philip Johnson/Alan Ritchie, Architects, P.C., 252 S.W.3d 586, 594 (Tex.
App.—Fort Worth 2008, pet. denied). An architect’s duty “depends on the particular agreement
entered into with his employer.” Id. 
                        Here, the contract for design and contract administration services that BVA entered
into with the Maxfields provided that BVA would:
 
visit the site at intervals appropriate to the state of the Contractor’s operations, or as
otherwise agreed by the Owner and the Architect in Article 12, (1) to become
generally familiar with and to keep the Owner informed about the progress and
quality of the portion of the Work completed, (2) to endeavor to guard the Owner
against defects and deficiencies in the Work, and (3) to determine in general if the
Work is being performed in a manner indicating that the Work, when fully
completed, will be in accordance with the Contract Documents. 
 
(Emphasis added.) The contract further provided: 
 
the Architect shall not be responsible for the Contractor’s failure to perform the
Work in accordance with the requirements of the Contract Documents. The
Architect shall be responsible for the Architect’s negligent acts or omissions, but
shall not have control over or charge of and shall not be responsible for acts or
omissions of the Contractor, Subcontractors, or their agents or employees, or of any
other persons or entities performing portions of the Work.
 
                        In Hunt v. Ellisor & Tanner, Inc., 739 S.W.2d 933, 935 (Tex. App.—Dallas 1987,
writ denied), a case in which a general contractor had failed to build a parking garage in accordance
with the plans and specifications, the court of appeals addressed the architect’s liability under similar
“endeavor to guard” contract language. The contract at issue in Hunt stated:
 
The Architect will make periodic visits to the site to familiarize himself generally
with the progress and quality of the Work and to determine in general if the Work is
proceeding in accordance with the Contract Documents. On the basis of his on-site
observations as an architect, he will keep the Owner informed of the progress of the
Work, and will endeavor to guard the Owner against defects and deficiencies in the
Work of the Contractor. The Architect will not be required to make exhaustive
on-site inspections to check the quality and quantity of the Work. The Architect will
not be responsible for the construction means, methods, techniques, sequences or
procedures, or for the safety precautions and programs in connection with the Work,
and he will not be responsible for the contractor’s failure to carry out the Work in
accordance with the Contract Documents.
 
Id. (emphasis added). The architect in Hunt made essentially the same argument made by BVA in
the present case—that due to the contract language stating that the architect is not responsible for
the contractor’s failure to carry out the work in accordance with the contract documents, the
architect’s agreement to “endeavor to guard” the owner against defects and deficiencies did
not expose the architect to liability for failure to identify any such defects or deficiencies. See id.
at 936-37. The court of appeals rejected that argument, stating:

We conclude that the language said to be exculpatory constitutes nothing other than
an agreement that the architect is not the insurer or guarantor of the general
contractor’s obligation to carry out the work in accordance with the contract
documents. We reach this conclusion because the first three sentences of [the
contract provision quoted above] impose a nonconstruction responsibility upon the
architect; to wit: to visit, to familiarize, to determine, to inform and to endeavor to
guard. In short, to provide information, not to make improvements upon the job site. 
Therefore, we reason that the fourth sentence of [the contract provision] . . . exist[s]
to emphasize the architect’s nonconstruction responsibility and to make certain that
the architect “will not be responsible for the [general] contractor’s failure to carry out
the work in accordance with the contract documents.” In short, the provider of
information to the owner does not insure or guarantee the general contractor’s work. 
It follows, and we so hold, that the contract does not exculpate [the architect] from
liability for the general contractor’s failure to carry out the work in accordance with
the contract documents.
 
Id. at 937 (emphasis added). We agree with the reasoning of Hunt and hold that while BVA is not
a guarantor or insurer of the general contractor’s work, it did take on “a nonconstruction
responsibility” to “visit, to familiarize, to determine, to inform[,] and to endeavor to guard” the
Maxfields from defects and deficiencies in the work. Thus, BVA may be held liable, not for the
general contractor’s negligence, but for a breach of its own duty as a “provider of information.” Id.;
see also Gables CVF, Inc. v. Bahr, Vermeer & Haecker Architect, Ltd., 506 N.W.2d 706, 710-11
(Neb. 1993) (reviewing similar “endeavor to guard” provision and holding that language stating
architect is not responsible for acts or omissions of contractor “does not absolve the architect from
liability for a breach of the architect’s contractual duty, if one exists, to inform the owner of
deviations from the building plans when the architect has agreed to make periodic observations”). 
This is consistent with the contract provision stating, “The Architect shall be responsible for
the Architect’s negligent acts or omissions, but shall not . . . be responsible for acts or omissions of
the Contractor . . . .”
                        As the court in Hunt clarified, “[W]e observe the separate and independent contract
obligations to [the owner] of both the general contractor and [the architect]. Each breached its
obligations. [The architect] breached its obligation to observe the progress of the work and to
endeavor to guard [the owner] against defects in the work.” 739 S.W.2d at 939. Here, too, BVA had
a nonconstruction obligation to endeavor to guard the Maxfields against defects in the work, and the
jury was entitled to determine whether BVA was negligent in the performance of that duty. 
                        The fact that the defects in question did not come to BVA’s attention during the
contract administration process does not alter the analysis, as BVA’s admitted failure to observe
visible and obvious defects affecting critical safety and structural integrity aspects of the balcony,
despite taking and reviewing photographs of those defects, represents more than a scintilla of
evidence that BVA did not fulfill its duty to “endeavor to guard” the Maxfields against defects and
deficiencies. While Nyfeler testified that a reasonable and prudent architect could have overlooked
the defects in the photographs, Pierce testified that for a reasonable and prudent architect hired to
do contract administration services, the defects “should have been observed” because the required
elements were “clearly missing.” The jury, as finder of fact, was responsible for evaluating
the credibility of witnesses and the weight to be given their testimony. See Golden Eagle Archery,
Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003). 
                        On appeal, BVA argues that it was not required to “conduct continuous, exhaustive
inspections of the contractors’ work to search for defects and deficiencies.” We agree. However,
the testimony is undisputed that the defects were visible and obvious in the photographs taken by
Schmeil. Black himself testified that the defects were clearly visible in the photographs, as did the
expert witnesses. Thus, no “continuous, exhaustive inspections” were necessary in this case, as BVA
could have discovered the defects by simply looking at the photographs taken by the architects in the
course of performing the contract administration services that they were paid $16,800 to perform. 
Furthermore, BVA’s expert witness acknowledged that defects such as the missing rim joist were
critical matters of structural integrity, that such defects were open and obvious in the photographs,
and that a reasonably prudent architect should pay special attention to issues involving the safety and
structural integrity of the balcony. It is difficult to imagine a more pressing safety concern than
whether the balcony, perched twenty feet from the ground, could withstand the weight of two people
without collapsing. 
                        While an architect providing contract administration services does not have a duty
to identify every possible deviation from the design drawings, we conclude that the architect does
have a duty to identify observable, open, and obvious deviations that implicate safety and structural
integrity and that were clearly presented to the architect. The evidence in this case is particularly
unique in that the defects can be identified on photographs actually taken by the architects in the
course of providing contract administration services. In contrast, in a situation where a defect is
created and then immediately obscured by walls or ceilings so that it is never observable to the
architect during a site visit, no duty to identify the defect would arise. Similarly, it is possible that
no duty would arise if a defect is only visible from a certain vantage point and there is no evidence
that the architect ever viewed the defect from that particular vantage point. In this case, however,
Schmeil himself took photographs depicting the defects and deviations from the design drawings. 
There is no question that the defects were not only observable to Schmeil during his site visit, but
also observable to both Schmeil and Black during their subsequent review of the photographs. 
                        We do not hold that BVA had a duty to inspect the construction site for defects, to
discover hidden defects, or to ascertain all deviations from the design drawings, regardless of their
significance or safety implications.


 Rather, we hold only that BVA had a duty, after contractually
agreeing to visit the site periodically to “endeavor to guard” against defects and deficiencies in the
work, to identify significant deviations from its own design drawings when those deviations
implicated critical structural integrity concerns and were plainly visible on photographs taken and
reviewed by BVA in the course of performing contract administration services. 
                        While BVA emphasizes that the construction of the residence was not complete at
the time the balcony photographs were taken, Black testified that at the stage of completion depicted
in the photographs, the rim joist and blocking should have been in place. Black also acknowledged
that the omission of the required rim joist would only have been visible while the residence was
under construction and would not have been observable during the contractually required final
inspection, which, for that matter, was never performed. Furthermore, when questioned as to
whether the contractor could have gone back after the photographs were taken and remedied some
of the defects by adding joist hangers or reattaching the support pipes using welded tabs, Pierce
testified that “it would be something that I would certainly want to ask about because it looks like
it’s a permanent installation, and it’s not in conformance with the [design] documents.”


 Given the
expert testimony that the balcony had the appearance of a permanent installation, the jury was
entitled to determine whether BVA’s failure to identify open, obvious, and observable defects in the
photographs constituted negligence in the performance of BVA’s contractual duty to endeavor to
guard against defects and deficiencies in the work.

Duty to Third-Party Visitors
                        The question then becomes whether the duty imposed on BVA, after having
contractually agreed to “endeavor to guard” against defects and deficiencies, to notify the owner of
open, obvious, and observable defects implicating critical safety and structural integrity concerns
extends to third-party visitors who are ultimately injured as a result of such defects. Balancing
factors such as the risk and foreseeability of injury with the consequences of imposing the burden
on the actor, we hold that it does. See Peavy, 89 S.W.3d at 33 (holding that question of whether
legal duty exists requires balancing of various factors). When an architect agrees to provide contract
administration services, that architect’s failure to notify the owner of observable and dangerous
deviations from the architect’s own design drawings, particularly in connection with an element like
a balcony where construction in accordance with the design drawings is a critical safety issue, creates
a foreseeable risk of injury for visitors lawfully on the premises. 
                        In the present case, BVA architects viewed photographs depicting nails where the
required bolts should have been, thin metal clips where welded tabs should have been, the absence
of the joist hangers required by the design drawings and the uniform building code, and the absence
of a rim joist and blocking, which Black acknowledged was critical to the structural integrity of the
balcony. Given the number and nature of these defects, we consider the risk of injury to a third-party
visitor from BVA’s failure to identify the defects and bring them to the owner’s attention to be
foreseeable. The owners of a residence are not typically the only individuals to ever set foot on the
premises, or to walk out onto the balcony. Furthermore, there was evidence in the present case that
Kathy Maxfield had indicated to BVA during the construction process that she intended to frequently
host visitors at the home.


 Photographs entered into evidence at trial also reflect that the balcony
provided a view of Inks Lake, which increases the likelihood that visitors to the Maxfields’ vacation
home would be drawn to step out onto the balcony.


 Under these circumstances, there was a
foreseeable risk that a third-party visitor to the home would be injured as a result of BVA’s failure
to fulfill its “nonconstruction responsibility” to “visit, to familiarize, to determine, to inform[,] and
to endeavor to guard.” See Hunt, 739 S.W.2d at 937. In determining whether a legal duty exists,
“foreseeability of the risk is the foremost and dominant consideration.” Greater Houston Transp.
Co. v. Phillips, 801 S.W.2d 523, 525 (Tex. 1990) (internal quotations omitted).
                        The foreseeability factor in this case is based, in part, on the public’s reliance on
design professionals to properly perform their contractual obligations as a matter of public safety. 
When a visitor to a residence, lawfully on the premises, walks out onto a balcony, the personal safety
of that visitor depends on certain professionals having non-negligently performed their contractual
duties with respect to the balcony. In a case where an architect was hired to perform contract
administration and to “endeavor to guard” the owner against defects and deficiencies in the work,
the visitor’s safety depends on the architect having fulfilled this duty using the level of care, skill,
and diligence that would be exercised by a reasonably prudent architect under similar circumstances.
                        Furthermore, the consequences of extending this duty to third parties are not so
burdensome to the architect as to outweigh the risk or likelihood of injury, as the duty applies only
in very limited circumstances such as those present here, where the defects were open, obvious,
observable to the architect, implicated critical safety and structural integrity concerns, involved
significant deviations from the architect’s own design drawings despite the fact that preapproval of
any such deviation was required, and were overlooked by an architect who contracted to provide
contract administration services and to “endeavor to guard” the owner against defects and
deficiencies in the work.


 
                        BVA argues that its contractual duty to the Maxfields cannot form a basis for the
negligence action in this case because Gravely and the Smiths were not third-party beneficiaries to
the contract. Privity of contract, however, is not required. See Hideca Petroleum Corp. v. Tampimex
Oil Int’l, Ltd., 740 S.W.2d 838, 846 (Tex. App.—Houston [1st Dist.] 1987, no writ) (“[T]he trend
is to dispense altogether with privity requirements in negligence suits.”); Shatterproof Glass Corp.
v. James, 466 S.W.2d 873, 879 (Tex. Civ. App.—Fort Worth 1971, writ ref’d n.r.e.) (“[A]rchitects
have been held liable to parties not in contractual privity with them, despite earlier fears that such
a broadened scope of liability would eliminate those professions.” (quoting Hallett & Collins,
Comment, Auditors’ Responsibility for Misrepresentation: Inadequate Protection for Users of
Financial Statements, 44 Wash. L. Rev. 139, 191 (1968))); see also Council of Co-Owners Atlantis
Condo., Inc. v. Whiting-Turner Contracting Co., 517 A.2d 336, 343-44 (Md. 1986) (holding that
duty of architect to use due care in fulfilling its contractual duties “extended to those persons
foreseeably subjected to the risk of personal injury,” given that “privity is not an absolute
prerequisite to the existence of a tort duty”); Evans v. Howard R. Green Co., 231 N.W.2d 907, 913
(Iowa 1975) (“The liability of the architect . . . is not limited to the owner who employed him; the
modern view is that privity of contract is not a prerequisite.”) (citation omitted). We therefore hold
that BVA’s duty to use due care in fulfilling its contractual duties to the Maxfields “extended to
those persons foreseeably subjected to the risk of personal injury” by its failure to do so. Whiting-Turner, 517 A.2d at 343-44. The fact that Gravely and the Smiths were not third-party beneficiaries
to the contract does not preclude them from bringing a claim for personal injuries resulting from
BVA’s negligent performance of the duties imposed by that contract. See Dukes, 252 S.W.3d at 594
(holding that contract for professional services gives rise to duty to exercise degree of care, skill, and
competence that reasonably competent members of profession would exercise under similar
circumstances).


 
                         To be clear, BVA did not have a duty to ensure that the construction site was a safe
place to work, verify that Nash was following federal safety regulations, or fulfill any
other obligation dependent on the right to control the means or methods of construction. See
Romero v. Parkhill, Smith & Cooper, Inc., 881 S.W.2d 522, 526-27 (Tex. App.—El Paso 1994, writ
denied) (holding that engineer did not owe duty to subcontractor’s employee injured on job site
where engineer did not control means and methods of construction); see also Graham v. Freese &
Nichols, Inc., 927 S.W.2d 294, 296 (Tex. App.—Eastland 1996, writ denied). BVA’s liability in this
case is not based on any duty that would require control of the means or methods of construction,
but on BVA’s “nonconstruction responsibility” to “visit, to familiarize, to determine, to inform[,]
and to endeavor to guard” against defects and deficiencies in the work. Hunt, 739 S.W.2d at 937. 
                        We also reiterate that an architect providing contract administration services does not
act as a guarantor or insurer of the work of the general contractor. Our holding today is limited to
the facts of this case, in which the architects agreed to provide contract administration services, took
and reviewed photographs of multiple open and obvious defects that negatively affected the
structural integrity of a balcony that they designed, the safety of which was critical, and failed to
observe those defects. Under the circumstances presented here, the jury was entitled to determine
whether BVA was negligent. The potential for negligence was based on the BVA’s duty as a
provider of information, rather than as a guarantor of the contractor’s performance. The extent of
the BVA’s liability, particularly given the potential negligence of other entities such as the general
contractor and subcontractor, was an issue for the jury to determine. Here, the jury resolved that
issue by attributing only 10% of the responsibility to BVA. We hold that this finding was supported
by legally sufficient evidence. BVA’s issue on appeal is overruled.

CONCLUSION
                        Having determined that the jury’s finding of negligence is supported by legally
sufficient evidence, we affirm the final judgment.
 
_____________________________________________
                                                                  Diane M. Henson, Justice 
Before Chief Justice Jones, Justices Puryear and Henson;
     Dissenting Opinion by Justice Puryear

Affirmed 
Filed: December 8, 2010